683 A.2d 666

**COMMONWEALTH of Pennsylvania**

v.

**Daniel KIMBALL, Appellant.**

Superior Court of Pennsylvania.

Argued June 24, 1996.

Filed Sept. 19, 1996.

194

Bruce A. Antkowiak, Greensburg, for appellant.

Anthony J. Rosini, Assistant District Attorney, Shamokin, for Commonwealth, appellee.

Before McEWEN, President Judge, and DEL SOLE, BECK, TAMILIA, KELLY, POPOVICH, JOHNSON, HUDOCK and SCHILLER, JJ.

JOHNSON, Judge:

In this appeal, we are asked to determine whether the court erred in denying Daniel Kimball's petition for relief pursuant to the Post–Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. In that petition, Kimball alleged that his trial counsel was ineffective for various reasons. To address this question, we must also determine the proper standard of

review applicable to claims involving ineffective assistance of counsel raised under the PCRA. Because we find that trial counsel was ineffective, we reverse the order denying Kimball's PCRA petition, vacate the judgment of sentence, and remand this matter for a new trial.

In March 1988, Rosemary Kleinsmith ("the victim") was found dead in her apartment. Following an investigation, Kimball was arrested and charged with murder. Kimball admitted at trial that he was involved in the victim's death but denied that he intended to kill her. He testified that he argued with the victim, struck her in the throat, and that the victim fell against the wall and died. The Commonwealth asserted that Kimball willfully and deliberately killed the victim by strangulation. The jury convicted Kimball of first-degree murder, and the court sentenced him to a term of life imprisonment. This Court affirmed Kimball's judgment of sentence, *Commonwealth v. Kimball*, 422 Pa.Super. 631, 613 A.2d 1261 (1992) (table), and our supreme court denied his petition for allowance of appeal.

Kimball then filed a PCRA petition, which was denied following a hearing. A panel of this Court reversed and remanded for a new trial, concluding that counsel was ineffective for failing to cross-examine Commonwealth witness James Shortridge concerning his motive for testifying and for calling Kimball's adoptive father to testify that Kimball was untrustworthy, angry, defiant, dishonest, and violent throughout his lifetime. The Commonwealth filed a petition for reargument, and we granted that petition for purposes of determining the proper standard of review in cases involving PCRA petitions raising ineffectiveness claims.

We now consider the following issues, which we have renumbered for purposes of review:

1. Whether [42 Pa.C.S. § 9543(a)(2)(ii) ] may [c]onstitutionally be interpreted to require a petitioner to prove a higher standard of prejudice than required by the Sixth Amendment to the Constitution of the United States and Article 1, Section 9 of the Constitution of the Commonwealth pursuant

to *Strickland v. Washington[*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),] and *Commonwealth v. Pierce*[,] 515 Pa. 153, 527 A.2d 973 (1987)?

2. Was trial counsel ineffective for failing to cross-examine a critical Commonwealth witness on a promise of lenient treatment made to him by the Commonwealth?

3. Was trial counsel ineffective for calling [Kimball]'s father as a witness where the father offered testimony as to his view that [Kimball] had exhibited a life-long history of bad character and that [Kimball] was not to be trusted?

4. Was trial counsel ineffective for failing to object to police testimony that [Kimball] terminated police questioning concerning the present charges, thereby improperly offering evidence of [Kimball]'s invocation of his Constitutional Rights?

5. Was trial counsel ineffective for failing to object to repeated instances of police testimony commenting unfavorably on the credibility of [Kimball] and offering improper opinion as to the ultimate issue in the case?

6. Was trial counsel ineffective for failing to object to repeated testimony by various Commonwealth witnesses regarding the character of the victim and the circumstances of her death?

7. Was trial counsel ineffective for failing to offer evidence known to her of [Kimball]'s intoxication on the night of the homicide and to otherwise fail to request a voluntary intoxication instruction from the Court?

Brief for Appellant at 4; Supplemental Brief for Appellant at 2.

Initially, we consider what standard of review is applicable to claims alleging ineffective assistance of counsel under the PCRA. In *Strickland v. Washington*, 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692–93 (1984), the United States Supreme Court set forth the following standard to be applied on direct appeal or in federal collateral proceedings when considering whether counsel was ineffective:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
>
> * * * * * *
>
> [To demonstrate that counsel was ineffective] the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.... [T]he defendant must [also] show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were *so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.* Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

(Emphasis added). Our supreme court adopted this standard in *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

There remains some dispute, however, as to whether the PCRA requires a more stringent showing of prejudice than that required on direct appeal. Pursuant to 42 Pa.C.S. § 9543(a)(2)(ii), to be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction resulted from "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." In *Commonwealth v. Buehl,* 540 Pa. 493, 658 A.2d 771 (1995), our supreme court was evenly divided as to what effect this language has on the standard of review applicable to PCRA ineffectiveness claims. Despite the fact that the language of § 9543(a)(2)(ii) is strikingly similar to the language in *Strickland,* Justice Montemuro, joined by Justices Zappala and Castille in an Opinion Announcing the Judgment of the Court, concluded that the PCRA "renders more stringent the prejudice requirement which must be satisfied before relief can be granted." *Buehl, supra,* at 505, 658 A.2d at 777. In

*Buehl,* the appellant asserted that counsel was ineffective for failing to request a cautionary instruction regarding the use of other crimes evidence. Justice Montemuro concluded that counsel was ineffective for failing to request such an instruction "because it cannot be said with any reasonable certainty that but for the . . . omission the outcome of Appellant's trial would not have been different." *Id.* at 508, 658 A.2d at 779. Despite this conclusion, however, Justice Montemuro stated that

> the circumstantial evidence presented by the Commonwealth . . . created overwhelming evidence of Appellant's guilt. Thus, while we are able to say that due to the prejudicial nature of the evidence in question the outcome of the Appellant's trial may have been different had counsel requested a cautionary instruction, we are unable to say that due to the omission the adjudication of guilt is unreliable.

*Id.*

To draw this conclusion, however, requires the appellate court to second guess the jury as to the defendant's guilt or innocence, which it is not permitted to do. *See Commonwealth v. Simmons,* 541 Pa. 211, 229, 662 A.2d 621, 630 (1995) (stating that the appellate court is not permitted to substitute its judgment for that of the jury). Thus, we would have extreme difficulty in interpreting the language of § 9543(a)(2)(ii) in this manner.

■ Instead, we find that Chief Justice Nix, in a Concurring Opinion, and Justices Cappy and Flaherty, in dissent, properly concluded that the language of § 9543(a)(2)(ii) merely reiterates the well-established prejudice standard set forth in *Pierce, supra,* and its progeny. *Buehl, supra,* at 515, 522, 658 A.2d at 782, 786. A determination that counsel's ineffectiveness would have resulted in a different outcome necessarily renders the truth-determining process unreliable. Accordingly, we conclude that there is no substantive distinction between the prejudice standard applicable on direct appeal and

the prejudice standard applicable under the PCRA. The distinction is in form only.

We note that our position is supported by the recent case of *Commonwealth v. Beasley,* 544 Pa. 554, 565–566, 678 A.2d 773, 778 (1996), in which our supreme court was asked to review, among other things, an ineffectiveness claim raised under the PCRA. In *Beasley,* the court stated that to prevail on such a claim, the defendant must demonstrate that "(1) the underlying claim is of arguable merit; (2) counsel's performance was unreasonable; and (3) counsel's ineffectiveness prejudiced defendant." *Id.,* citing *Pierce, supra.* Thus, the appellant was not required to prove a heightened standard of prejudice.

Based upon our determination that the prejudice standard is the same on direct appeal and under the PCRA, we need not determine whether the legislature could constitutionally require a defendant to meet a more stringent standard of prejudice under the PCRA than that set forth in *Strickland.*

■ We now turn to Kimball's claims that the PCRA court erred in denying his petition because his trial counsel rendered ineffective assistance. When examining a post-conviction court's grant or denial of relief, this Court's scope of review is "limited to determining whether the court's findings were supported by the record and the court's order is otherwise free of legal error. The findings of the post-conviction court will not be disturbed unless they have no support in the record." *Commonwealth v. Granberry,* 434 Pa.Super. 524, 530, 644 A.2d 204, 207 (1994) (citation omitted).

■ Kimball first claims that counsel was ineffective for failing to cross-examine Commonwealth witness James Shortridge regarding his motivation for testifying. Shortridge, Kimball's former cell-mate, testified that Kimball told him that Kimball had strangled the victim with his hands and then wrapped a telephone cord around her neck to ensure that she was dead. N.T., December 2, 1989, at 138. This testimony was important because Kimball did not dispute that he was involved in the victim's death, but did deny that he choked her. Shortridge's testimony was relevant to the question of

whether Kimball was guilty of first-degree murder or a lesser offense. In return for Shortridge's testimony, the prosecution agreed that Shortridge could serve his sentence in the county jail rather than in the state penitentiary. Although Kimball's counsel was aware of this arrangement, she did not question Shortridge about it. N.T., May 31, 1994, at 35.

In *Commonwealth v. Evans*, 511 Pa. 214, 224–25, 512 A.2d 626, 631–32 (1986), our supreme court stated that

> whenever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

In the present case, Shortridge's testimony could have been perceived as an attempt to gain favorable treatment from the Commonwealth. Accordingly, Kimball's claim that counsel should have cross-examined Shortridge concerning his arrangement with the Commonwealth has arguable merit. We must therefore consider whether trial counsel had a reasonable basis for failing to pursue such a line of questioning.

The trial transcript does not reflect any attempt by defense counsel to question Shortridge regarding his arrangement with the Commonwealth. At the PCRA hearing, counsel testified that she recalled "wanting desperately to bring the deal out," N.T., May 31, 1994, at 35, but that she was prevented from doing so. *Id.* Counsel could not, however, recall how she was prevented from conducting such a cross-examination. *Id.* She stated that she recalled an off-the-record conversation in which the prosecutor indicated that he would strenuously object to any such questioning. *Id.* at 36. Because, as a general rule, counsel must be allowed to cross-examine Commonwealth witnesses concerning bias, *Commonwealth v. Culmer*, 413 Pa.Super. 203, 212, 604 A.2d 1090, 1094–

95 (1992), we cannot find that counsel's failure to pursue such a line of questioning based upon an off-the-record comment by the prosecutor was reasonable.

Finally, we consider whether counsel's failure to conduct proper cross-examination of Shortridge prejudiced Kimball. The PCRA court concluded, and the Commonwealth asserts, that Kimball suffered no prejudice because of overwhelming independent evidence of guilt in this case. As stated above, the critical issue at trial was whether Kimball intended to kill the victim or whether he accidentally caused her death. Kimball testified that he accidently caused the victim's death. N.T., December 4, 1989, at 300; N.T., December 5, 1989, at 471–73. Trooper Francis Bower, who took Kimball's statement, testified that Kimball said he "g[ave the victim] a karate chop[,] . . . she fl[ew] across the room[,] . . . her head hit[ ] the wall and she slump[ed] down." N.T., December 2, 1989, at 184–85. Kimball's aunt also testified to this effect. N.T., December 4, 1989, at 289–90. The medical experts expressed differing opinions as to the cause of the victim's death. The expert for the defense stated that the victim's death could have been caused by two karate chops to the neck, N.T., December 5, 1989, at 551, and the Commonwealth's expert stated that the victim died as a result of manual strangulation. N.T., December 4, 1989, at 237. Shortridge was the only witness who testified that Kimball stated that he had willfully murdered the victim by strangulation. Shortridge's credibility was, therefore, of the utmost importance, and counsel should have questioned him concerning his arrangement with the Commonwealth. Because we believe that counsel's failure to pursue such a line of questioning is an unexplained, serious omission that rendered the verdict unreliable, we conclude that counsel was ineffective. *See Commonwealth v. Murphy*, 527 Pa. 309, 591 A.2d 278 (1991) (finding counsel ineffective for failing to cross-examine Commonwealth witness on bias where witness's credibility was crucial, as she was the only eyewitness to the crime).

■ Even if we had resolved Kimball's first ineffectiveness claim in the Commonwealth's favor, Kimball has presented a

second meritorious claim. Kimball asserts that counsel was ineffective for introducing the testimony of his adoptive father, Reverend John Kimball. Kimball's counsel had apparently planned to present a defense of diminished capacity to which Reverend Kimball's testimony would have been important. During an in camera hearing, however, the trial court ruled that it would not permit Kimball's psychologist to testify, thus undermining any presentation of a diminished capacity defense. Despite this ruling, counsel called Reverend Kimball, who testified that from infancy his son had exhibited behavioral problems. N.T., December 5, 1989, at 395. The Reverend testified that his son engaged in inappropriate behavior with his sisters and attempted to exploit them. *Id.* at 400. Reverend Kimball further testified that he had signed a petition to have his son adjudicated delinquent. *Id.* He also stated that his son was not trustworthy, *id.* at 403, that he was angry and violent, *id.* at 415, and that he was a bully who "tended to go after weaker people." *Id.* Because the court had already ruled that Kimball's psychologist would not be permitted to testify concerning diminished capacity, we fail to see how such testimony could have served Kimball's interests. Thus, we conclude that Kimball's claim that this witness should not have been called by the defense is arguably meritorious.

To determine whether counsel had a reasonable basis for introducing this testimony, we must "review the record in light of appellant's theory of the case, and determine whether the attorney's decisions were reasonably designed to benefit the client." *Commonwealth v. Polston,* 420 Pa.Super. 233, 248–49, 616 A.2d 669, 677, *appeal denied,* 534 Pa. 638, 626 A.2d 1157 (1993). Kimball's trial attorney stated at the PCRA hearing that Reverend Kimball's testimony was part of her strategy to prove that Kimball was a product of his environment and to elicit the sympathy of the jurors. N.T., May 31, 1994, at 48–49. We cannot agree that the introduction of this testimony was reasonably designed to benefit Kimball. Indeed, this testimony supported the Commonwealth's theory that Kimball intentionally killed the victim, as it provided the jury with facts suggesting that Kimball was the type of person who

would be capable of committing first-degree murder. Moreover, in light of the conflicting testimony concerning the victim's cause of death, we believe that Reverend Kimball's damaging testimony prejudiced Kimball. Therefore, we find that counsel was also ineffective on these grounds.

Accordingly, we conclude that the court erred in denying Kimball's PCRA petition. Because of our resolution of these two issues, we do not address Kimball's remaining claims.

Based on the foregoing, we reverse the order that denied Kimball's PCRA petition, vacate the judgment of sentence, and remand this matter for a new trial.

Order **REVERSED**. Judgment of Sentence **VACATED**. Case **REMANDED**.

McEWEN, P.J., files a Concurring Statement.

HUDOCK, J., files a Concurring and Dissenting Statement.

TAMILIA, J., files a Dissenting Opinion.

POPOVICH, J., files a Dissenting Opinion.

McEWEN, President Judge, concurring:

I concur in the determination that trial counsel was ineffective and the ruling that appellant must receive a new trial.

HUDOCK, Judge, concurring and dissenting:

I concur in the opinion of the majority that counsel was ineffective, but for reasons other than those relied upon by the majority. I believe counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place". 42 Pa.C.S.A. section 9543(a)(2)(i). I further believe such a finding is a prerequisite to PCRA relief.

The language of section 9543(a)(2)(i) cannot be ignored; the legislature included it in the PCRA for some purpose. That purpose is well expressed by Justice Montemuro, joined by Justices Zappala and Castille, in *Commonwealth v. Buehl*, 540 Pa. 493, 505 658 A.2d 771, 777 (1995), where he pointed out

that the language means that the PCRA "renders more stringent the prejudice requirement which must be satisfied before relief can be granted".

TAMILIA, Judge, dissenting:

While I agree with the majority's conclusion that "there is no substantive distinction between the prejudice standard applicable on direct appeal and the prejudice standard applicable under the PCRA", I respectfully dissent from that portion of the majority's Opinion which finds petitioner has satisfied this standard under the facts of the instant case.

Our Supreme Court has held that "under [*Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987),] and its progeny, a defendant is required to show that counsel's ineffectiveness was of such magnitude that the verdict essentially would have been different absent counsel's alleged ineffectiveness." *Commonwealth v. Howard*, 538 Pa. 86, 100, 645 A.2d 1300, 1308 (1994). Justice Cappy's dissenting opinion in *Commonwealth v. Buehl*, 540 Pa. 493, 658 A.2d 771 (1995), upon which the majority expressly relies, also recognizes that a defendant has the burden of establishing "that there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different." *Id.* at 516, 658 A.2d at 783 (Cappy, dissenting).

The majority finds that petitioner has fulfilled this burden by demonstrating that defense counsel failed to elicit from James Shortridge evidence that he had entered into an agreement with the Commonwealth, whereby he would be allowed to serve his sentence in a county jail, rather than a state prison, in exchange for his testimony that petitioner admitted strangling the victim. I believe the majority dramatically overstates the importance of Mr. Shortridge's testimony. In fact, my review of the record indicates substantial, independent evidence that the victim died of strangulation, rather than from karate chops, as alleged by petitioner. In light of this evidence, I would find that petitioner is unable to show the verdict adjudicating him guilty of first degree murder

"essentially would have been different absent counsel's alleged ineffectiveness." *Howard, supra.*

Initially, Dr. Isadore Mihalakis, a forensic pathologist who conducted the autopsy on the victim, testified to his belief, within a reasonable degree of medical certainty, that the victim "died as a result of manual strangulation with fracture of the thyroid cartilage [Adam's apple] and the hyoid bone." (N.T., 12/4/89, p. 244.) Moreover, he testified that the injury to the victim's thyroid cartilage was "characteristic of a manual strangulation." (N.T. at 237.) These facts, among others, led Dr. Mihalakis to express his opinion, again within a reasonable degree of medical certainty, that the victim did not die from karate chops, as alleged by petitioner (N.T. at 238).

Petitioner claims this clear and convincing medical testimony was undermined by the defense medical expert, Dr. Cyril Wecht. However, on cross-examination, Dr. Wecht testified as follows:

Q. [DISTRICT ATTORNEY]: ... Doctor, you would agree, wouldn't you, that the fractures of the right greater horn of the hyoid bone and the left superior horn of the thyroid cartilage were significant autopsy findings by Dr. Mihalakis?

A. [DR. WECHT]: Yes.

Q. In fact, the most significant?

A. Yes.

Q. And isn't that because those injuries are consistent with, in fact, usually found in manual strangulations?

A. They're consistent with strangulation, and statistically, they would be found most often in manual strangulation [then] with ligature strangulation, and then with blows to the neck, probably in that order, statistically.

Q. So if Dr. Mihalakis testified that those injuries are characteristic of manual strangulation, would you agree?

A. Yes. That is a reasonable statement.

(N.T., 12/7/89, pp. 574–575.) Thus, although Dr. Wecht was unable to express an opinion as to the victim's cause of death

within a reasonable degree of medical certainty, he clearly testified that the probability that the victim died from manual strangulation was "statistically" higher than the probability she died from karate chops. In fact, as the above-quoted testimony indicates, Dr. Wecht believed blows to the neck were the least likely cause of death of the three possibilities expressed.

On further cross-examination, the district attorney presented to Dr. Wecht a text entitled *"The Medical Logical Investigation of Death, Guidelines for the Application of Pathology to Crime Investigation "* (N.T. at 595). Dr. Wecht stated that he was familiar with the text and its author, Dr. Warner U. Spitz (N.T. at 595–596). Dr. Wecht then testified as follows:

> Q. Let me read something to you. Would you agree if Warner Spitz wrote that, "Fractures of the larynx, including the hyoid bone and thyroid and cricoid cartilages are frequently associated with manual strangulation." Would you agree with that?
>
> A. Yes.

(N.T. at 596.)[1] Taken as a whole, Dr. Wecht's testimony supports, rather than contradicts, Dr. Mihalakis' central finding that the victim died as a result of manual strangulation. The only difference was the degree of certainty with which the doctors were able to express their respective opinions.

Lastly, and most importantly, the Commonwealth elicited the following testimony on direct examination of the victim's neighbor, John Strausser:

> Q. The late night hours of Thursday [July 21, 1988], that is after midnight, in the early morning hours of Friday [July 22, 1988], what were you doing? Were you awake? Were you asleep?
>
> A. No, I was sleeping.
>
> Q. And where were you sleeping?
>
> A. In the middle bedroom.

1. The district attorney also noted a passage from the text in which Dr. Spitz states, "I have never seen a hyoid bone fractured by a blow to the neck." (N.T. at 597.)

208

Q. In this same apartment building [where the victim lived]?

A. Yes.

Q. And is there anything unusual that happened in those early morning hours while—that you can remember?

A. Yes.

Q. Describe clearly, loudly for the jury what unusual happened in your life at that time?

A. Okay, I was sleeping and I was awakened by Rosemary screaming, "Help me", either ["]he is choking me", or "They're choking me." So I got up looked at the clock, walked out to the front room, looked out the window. I didn't see nothing, I didn't hear anything else. So I more or less went back to bed and went to sleep.

. . . . .

Q. So you went back to bed, do you know if anybody went downstairs to look into it further?

A. Not that I know of.

Q. Is there any doubt in your mind about who was screaming those words?

A. No.

(N.T., 11/28/89, pp. 98–99.) Thus, at the precise time petitioner admits killing the victim, a neighbor, who knew the victim and was familiar with her voice, heard her scream that someone was "choking her." The victim's final words, which provide powerful and competent evidence of the manner in which she died, must not again fall on deaf ears.

In conclusion, I find ample, compelling and independent evidence that petitioner killed the victim by manual strangulation, rather than karate chops. Thus, even assuming defense counsel was ineffective for failing to elicit from James Shortridge evidence of his deal with the Commonwealth, petitioner is unable to meet his burden of establishing that but for the ineffectiveness the outcome of his trial "essentially would have been different[.]" *Howard, supra.* Hence, I dissent.

POPOVICH, Judge, dissenting:

I respectfully dissent from the majority's opinion that the PCRA does not require greater proof of prejudice resulting from counsel's assistance than the standard applicable on direct appeal. Although I recognize that *Commonwealth v. Buehl,* 540 Pa. 493, 658 A.2d 771 (1995), was a plurality opinion, I agree with Justice Montemuro that claims of ineffective assistance raised under the PCRA face a more stringent prejudice requirement. Specifically, the appellant must prove that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii).

Presently, Judge Tamilia agrees with the majority that there is not a more stringent standard to establish ineffective assistance under the PCRA. While I disagree with Judge Tamilia and the majority regarding that issue, I agree with Judge Tamilia's conclusion that appellant did not establish that counsel was ineffective. As it is my opinion that appellant failed to prove ineffective assistance under the less stringent standard proposed by the majority, clearly, such proof would be insufficient to overcome the standard set forth in *Buehl.* Accordingly, I dissent.