COMMONWEALTH of Pennsylvania,
Appellant,

v.

Thomas M. BALENGER, Appellee.

Superior Court of Pennsylvania.

Argued Oct. 28, 1997.

Filed Dec. 30, 1997.

Thomas N. Farrell, Asst. Dist. Atty., Pittsburgh, for Com., appellant.

Harold Gondelman, Pittsburgh, for appellee.

Before POPOVICH, HUDOCK and HESTER, JJ.

HESTER, Judge:

The Commonwealth appeals the April 3, 1996 order granting appellee, Thomas Balenger, a new trial. At issue is whether the prosecutor's amorous relationship with appellee's former girlfriend was a conflict of interest requiring the grant of a new trial. We agree with the PCRA court that there was a conflict of interest and that all prior counsel were ineffective for failing to raise this issue. Hence, we affirm.

The prosecutor at appellee's trial, William Jones, Jr., began a meretricious relationship with Lana Conte prior to the institution of the charges at issue in this case. At the time, Jones was married to Lola Jones. Lana was appellee's girlfriend when Jones met her. Through Lana, Jones learned that appellee and Christopher Grabowski had been involved in a robbery. Grabowski was questioned and confessed. Charges were instituted against appellee. The record establishes that Jones was interested in pursuing these charges in order to eliminate appellee as a rival for Lana's affections. He prosecuted this case against appellee even though the case originally had been assigned to another assistant district attorney. Jones and Lola subsequently divorced, and he and Lana married.

On June 19, 1989, appellee was charged with two counts of criminal conspiracy and one count each of burglary, armed robbery, theft, terroristic threats, unlawful restraint, and false imprisonment. At the time the charges were instituted, appellee was jailed on charges relating to his armed robbery of a store known as Katz 'N Kids Deli in the Squirrel Hill section of Pittsburgh. During the course of that robbery, the owner of the store had been shot and injured.

The June 19, 1989 charges stemmed from an incident that had occurred approximately twenty months earlier, on November 8, 1987. That day, William F. Martin was robbed at his residence at 105 Marshall Drive, in the Mount Lebanon section of Pittsburgh. The perpetrators absconded with $70,000 in cash and jewelry.

At approximately 10:30 p.m. on November 8, 1987, Christopher Grabowski came to Mr. Martin's door and said that his car was broken down. Mr. Martin led Grabowski to the telephone, and Grabowski dialed but did not receive an answer. When Grabowski said that he was not able to reach the person he was calling, Mr. Martin told him to return if he needed any further help.

Approximately one-half hour later, the doorbell rang again. Mr. Martin looked through a peephole and saw Grabowski. However, when he opened the door this time, a masked man forced his way into the house, followed by Grabowski.

The masked man, who was armed, told Mr. Martin that he knew that Mr. Martin owned gas stations, had significant amounts of cash, and kept that cash in a safe. The masked man later was identified as appellee. When Mr. Martin told appellee that he had just returned from the bank, appellee hit him on the face with the gun, giving him a black eye.

Mr. Martin took the men to his safe and opened it. The perpetrators took cash, jewelry, and a gun. They then bound Mr. Martin with cord and left.

Natalie Urban worked at one of Martin's gas stations and began dating appellee around September, 1987. Appellee constantly asked Ms. Urban questions about the financial operations of the gas station and other facts about Mr. Martin. Two days before the robbery, appellee told Urban that he intended to rob Mr. Martin. On the night of the incident, appellee went to Ms. Urban's home and told her that he and another person robbed Martin. Several days after the robbery, Ms. Urban accepted $5,000 in cash from Tony Mieglitz for supplying information about Mr. Martin. Mieglitz is a close friend of appellee. Ms. Urban pled guilty to receiving stolen property in connection with her involvement in the incident.

Mieglitz was interviewed by police in the presence of a lawyer. Mieglitz told police that appellee had asked for his help in robbing Mr. Martin, but Mieglitz refused. Mieglitz had agreed to take the money to Ms. Urban, knowing that it was proceeds of the Martin robbery. While this information

from Mieglitz was used in obtaining a warrant, he did not testify at trial.

Grabowski, who was jailed, was interviewed in connection with the incident. While he did not sign a written confession, Grabowski told police that he was recruited by appellee to assist in Mr. Martin's robbery. Grabowski said that he came to the Martin residence and asked to use the telephone because his car was broken. Grabowski pretended to telephone someone, left the house, and returned with appellee. He admitted taking cash and jewelry from the Martin home. His redacted confession was introduced at trial.

Also introduced at trial was evidence that on November 17, 1987, appellee had purchased a car using $6,100 in cash and that he had no visible means of having that amount of cash.

By the time these charges were instituted, appellee was in prison, charged with the Katz 'N Kids incident. He and Grabowski were tried together in December, 1989, and convicted of one count each of burglary, robbery, theft by unlawful taking, unlawful restraint, and conspiracy. Appellee was sentenced on September 25, 1990, to thirteen to twenty-six years imprisonment. On direct appeal, appellee raised six issues, including the ineffective assistance of trial counsel.

One of the allegations of ineffectiveness included that, "Appellant has informed present counsel that he has evidence to suggest that the Assistant District Attorney was in addition carrying on a relationship with [appellee's] girlfriend. This allegedly was told to trial counsel and trial counsel did not act on this information." Superior court memorandum, 9/10/91, at 10. We ruled that the assertion was not a sufficient offer of proof regarding the facts and that, as the reviewing court, we had no basis upon which to conclude that counsel was ineffective. We also stated that our resolution of the issue did not preclude appellee "from seeking collateral relief under the Post Conviction Relief Act" as to the merits of the claim.

On June 1, 1993, appellee filed a postconviction petition. Included in that petition was the allegation that trial counsel was ineffective for failing to apprise the court of a relationship between the assistant district at-

torney who prosecuted appellee and appellee's girlfriend, Lana. Appellee also averred that prior to trial, Lana had visited him in jail and that Lana gained information from appellee and funneled it to Jones to aid Jones in the prosecution of this action.

Appellee's appointed counsel then filed an amended petition, alleging that trial counsel was ineffective for failing to delve into the Conte–Jones relationship further. In the amended petition, appellee averred that Jones was using Conte during the course of these proceedings as an "agent" to "conduct investigations" for the Commonwealth. Amended petition for PCRA relief, 12/6/93, at 2. In the petition, appellee also averred that he told trial counsel about the situation, but counsel did not investigate or apprise the court of these charges.

Hearings were conducted on the allegations. The first hearing was held on September 8, 1995. Appellee's trial counsel, Kevin Sasinoski, testified as follows:

Q. Do you recall meeting with Mr. Balenger and him raising the question of a relationship between his former girl friend or fiancée with Mr. Bill Jones, who was prosecuting the case at the time?

A. I believe that he may have, but again, it is just general recollection. The specifics of what the relationship was or what was said, I don't remember at this time.

Q. Did you make any effort to ascertain what the extent of that relationship was?

A. I think in general terms he may have said that the girl who was going to testify against him he believed or it was his belief that she was seeing Mr. Jones socially. I said, How do I prove that? Where do we go with that? *I don't know that I really was sure what to do with that.*

Notes of Testimony ("N.T."), 9/8/95, at 20 (emphasis added). Mr. Sasinoski also indicated that he conducted no further investigation into appellee's allegations.

On March 5, 1996, the PCRA court issued findings of fact for purposes of the record

with respect to the PCRA petition. These findings of fact are all supported by testimony from March 1, 1996, and March 4, 1996 hearings.

In January, 1987, appellee was paroled from a state sentence he then was serving. Approximately six weeks later, he met Lana Conte, who is now Lana Conte Jones. They started to live together by spring. They continued the intimate relationship throughout the summer and fall of 1987. During this period, appellee continued to commit crimes and also boasted about them to Lana. During this period, he committed the armed robbery of the Katz 'N Kids and Mr. Martin.

Shortly before Thanksgiving, 1987, Lana decided she could no longer continue her relationship with appellee, and she asked for a transfer from her employer, U.S.Air, to Cleveland, Ohio, to get away from him. Lana and appellee had dinner together on Thanksgiving, 1987. She told him then that she was moving to Cleveland and terminating their relationship. In the meantime, appellee had learned that there was a warrant for his arrest for the Katz 'N Kids robbery, and he told her that he was leaving the jurisdiction.

However, appellee and Lana continued to have contact with each other. Appellee's location in Maryland was discovered by police through a wiretap placed on Lana's telephone. Appellee was apprehended and returned to Allegheny County Jail, where he was held pending disposition of his parole violation. While appellee was in the county jail, Lana returned from Cleveland and resumed her relationship with him, visiting him on a regular basis at the county jail. Appellee was returned to the state correctional institution in Pittsburgh after his parole violation proceedings, and Lana visited him at least twice at that prison. Appellee produced numerous letters that Lana wrote to him while he was jailed at both institutions. He also produced photographs of their meetings.

Assistant district attorney William Jones was assigned to the Katz 'N Kids robbery prosecution. He interviewed Lana as a possible witness in that case and concluded that she might be called to testify. On December 7, 1988, appellant tendered a guilty plea to robbery in the Katz 'N Kids prosecution. A mandatory sentence was involved in that case due to appellee's use of a firearm, and judgment of sentence of five to ten years imprisonment was imposed the same date.

On December 7, 1988, Lana contacted Jones and asked if she was needed as a witness, and Jones responded that a guilty plea had been entered and that she was not needed. Lana said that she wanted to talk to Jones, and they met at Mitchell's Restaurant in Pittsburgh. They left Mitchell's Restaurant and went to Costanzo's Restaurant, where they stayed for seven hours. At Costanzo's restaurant, Lana recalled that appellee had told her that he had robbed Mr. Costanzo. She then told Jones about that robbery and seven other robberies appellee had told her he committed. One of those robberies was the one at issue.

Jones missed his bus home, and Lana drove him to where he had parked his car, a parking lot in Waterworks Plaza. They arrived in the lot at approximately 11:30 p.m. Accordingly to Lana and Jones, they were sitting in Lana's car talking when Jones's wife arrived and started to berate them.

Jones's wife at that time, Lola Jones, testified that she became concerned when Jones did not arrive home on December 7, 1988, at his usual time. He was working in the narcotics division, and she was afraid something had happened to him. At around 11:30, Lola proceeded to search for her husband and went to the Waterworks Plaza since she knew that was where he parked his car. When she arrived, only two cars were in the parking lot, Jones's car and another one. Lola looked into her husband's car, saw nothing, and proceeded to the other car, where she saw her husband and Lana partially disrobed and engaged in sexually activity.

Lola testified that her husband did not return home that evening. Jones testified that he had been locked out of the house. However, when Jones told his wife that he wanted to spend New Year's Eve with Lana, Lola ejected him from the house and instituted divorce proceedings.

Lola also related various discussions that Jones and she had about his relationship with

Lana. Jones told Lola that "he had to save Lana" and that he was Lana's "savior, her psychiatrist and her attorney." Reproduced Record ("R.R.") at 345a. Jones said that he was in love with Lana and that he had "to put [appellee] away forever to save Lana." *Id.* at 346a.

After the December 7, 1988 incident, Lola contacted one of appellee's colleagues in the district attorney's office. She told the colleague, also an assistant district attorney, that she was concerned that her husband was having an affair with the girlfriend of a convict. Lola stated that she and "everyone in the DA's office knew" that Jones was "trying to prosecute" appellee. *Id.* at 408a.

Meanwhile, Jones started to investigate the charges Lana made against appellee. Since Jones had a good working relationship with one of the Mount Lebanon police officers, he concentrated on the Martin robbery. Based on the investigation, the charges at issue herein eventually were instituted. The trial court found that "although [the Martin] case was assigned to another assistant district attorney, Jones sought out the file so that he could prosecute [appellee] for these charges and, in fact, did so." Trial court opinion 2/3/97, at 8. This particular finding of fact, contrary to the Commonwealth's assertion, is supported by the record. *See* R.R. at 410a.

The PCRA court determined that Jones had not falsified or manufactured evidence. However, the court also found that "the prime motivation for this particular prosecution was the removal of a romantic competitor from the life of Mr. Jones." N.T., 3/5/96, at 14. The PCRA court determined that appellee had informed his trial counsel about the romantic involvement between Jones and Lana but that counsel had not brought it to the attention of the trial court. The PCRA court granted appellee a new trial, reasoning that he had the right to have his case prosecuted by someone with "his mind on the public purpose and not by an advocate whose judgment may be blurred by subjective reasons." N.T., 3/4/96, at 13. This appeal by the Commonwealth followed.

After the Commonwealth filed this appeal, the PCRA court issued an exhaustive and very well reasoned opinion in support of its decision. We affirm its grant of a new trial based on that opinion, dated February 3, 1997.

However, we briefly address the Commonwealth's concerns. The PCRA court applied the case of *Commonwealth v. Eskridge,* 529 Pa. 387, 604 A.2d 700 (1992). In *Eskridge* the defendant was convicted of homicide by vehicle while driving while under the influence. The issue was whether he was entitled to a new trial since law partners in the district attorney's private practice represented the victims of the crime in a civil action instituted based on the same actions underlying the defendant's criminal conviction. The Supreme Court ruled that the conflict of interest should have precluded the district attorney's office from prosecuting the defendant and granted the defendant a new trial, even though the district attorney himself had not prosecuted the action.

The Court noted that the successful criminal prosecution facilitated the prosecutions of the civil actions and that therefore, the district attorney had a direct financial interest in obtaining a conviction. The finding that this financial interest constituted a conflict was based on the distinct role of the criminal prosecutor who, unlike a private attorney, is required to use independent judgment and prosecute an action in the interests of justice and not simply as an advocate. *See Rule of Professional Conduct 3.8, comment.* The Court also noted that a prosecutor must abandon a prosecution if justice will be promoted by that action. *Rule of Professional Conduct 1.3, comment.*

The *Eskridge* Court concluded that a direct conflict could prevent fulfillment of those responsibilities. The Court further reasoned that while a defendant does not have a right not to be prosecuted, he does "have a right to have his case reviewed by an administrator of justice with his mind on the public purpose, not by an advocate whose judgment may be blurred by subjective reasons." *Id.,* 529 Pa. at 390, 604 A.2d at 701, quoting *Commonwealth v. Dunlap,* 233 Pa.Super. 38, 335 A.2d 364, 368 (1975) (Hoffman, J., dissenting). The Supreme Court observed that the responsibility of a member of the district attorney's office is to seek justice, protecting

the innocent as well as convicting the guilty. This responsibility materially differs from the role of a private attorney, who is solely an advocate. The Court held, "a prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case; under such circumstances a defendant need not prove actual prejudice in order to require that the conflict be removed." *Id.*, 529 Pa. at 392, 604 A.2d at 702; *see also Commonwealth v. Breighner*, 453 Pa.Super. 477, 684 A.2d 143 (1996).

The Commonwealth's first argument is that the trial court erred in applying *Commonwealth v. Eskridge, supra*, retroactively in this PCRA proceeding since the issue was not properly preserved on direct appeal. It notes that prior to *Eskridge*, a defendant had to prove actual prejudice in order to obtain a new trial due to a prosecutor's conflict of interest. Herein, the PCRA court found appellee has not demonstrated the existence of actual prejudice from this conflict. The Commonwealth continues that trial counsel was not ineffective for failing to raise the issue of the conflict of interest since under the law in 1989–90, wherein actual prejudice was required, appellee was not entitled to relief.

■ Where a case breaks with past precedent, it is not applied to a case on collateral review "unless the decision announcing the new rule of law was handed down during the pendency of the defendant's direct appeal and the issue was properly preserved on direct appeal." *Commonwealth v. Todaro*, 549 Pa. 545, ——, 701 A.2d 1343, 1348 (1997); *accord Commonwealth v. Gillespie*, 512 Pa. 349, 516 A.2d 1180 (1986); *Commonwealth v. Galloway*, 433 Pa.Super. 222, 640 A.2d 454 (1994).

■ The present action was pending on appeal in 1991, just before the issuance of the *Eskridge* decision. Furthermore, the issue was raised on direct appeal. In fact, we held that the allegations were not specific enough but also that the issue could be raised in a post-conviction proceeding. In light of our express ruling that the issue could be raised in a collateral proceeding and the fact that the appeal was pending in 1991, just prior to *Eskridge*, that case should be applied. As the PCRA court noted:

This issue of the entitlement of the defendant to a new trial when he has established that the prosecutor has an impermissible conflict of interest was put before the Pennsylvania Supreme Court on March 4, 1991, and that Court decided that issue on March 19, 1992, in the case of the *Commonwealth v. Eskridge, supra.* It is clear that had [appellee's] counsel prepared a record on this issue that that claim would have been reviewed by the Superior Court and, if it had been rejected, [appellee] still would have had the opportunity to present this issue to the Supreme Court in a petition for allocatur and in light of the decision in the Pennsylvania Supreme Court in *Commonwealth v. Eskridge, supra*, it is likely that that Court would have accepted a similar issue for review and decision. It is clear then that [appellee] would have had his claim addressed by that Court and would be entitled to have his current claim addressed by the standards enunciated in *Commonwealth v. Eskridge, supra.* In light of the observation made by the Superior Court in [appellee's] original appeal [that the issue could be raised in a post-conviction proceeding], the instant post-conviction proceeding should be viewed as a continuation of that appellate process and, accordingly, [appellee] should have the benefit of the standard enunciated in *Commonwealth v. Eskridge, supra.*

Trial court opinion, 2/3/97, at 20–21. We concur with this reasoning and conclude that the PCRA court did not err in applying *Eskridge* to this action.

■ The Commonwealth next contends that appellee has failed to establish that prior counsel's actions prejudiced him. We disagree. The test for ineffective assistance of counsel is established:

According to *Commonwealth v. Pierce*, 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987) and its progeny, the defendant must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel's performance was unreasonable; and (3) counsel's ineffectiveness prejudiced him.... Prejudice, in the context of ineffective assistance of counsel, means that there must be a reasonable possibility that but for counsel's

unprofessional errors, the result of the trial would have been different. *Commonwealth v. Johnson*, 516 Pa. 407, 413, 532 A.2d 796, 799 (1987)....

*Commonwealth v. Craver*, 547 Pa. 17, 22, 688 A.2d 691, 693–94 (1997). We have ruled that this test, and not a more stringent one, is to be applied in the PCRA context. *Commonwealth v. Kimball*, 453 Pa.Super. 193, 683 A.2d 666 (1996)(en banc), *petition for allowance of appeal granted*, 548 Pa. 615, 693 A.2d 587. Herein, as noted above, there is a reasonable probability that appellee would have been awarded a new trial on direct appeal had counsel raised this issue with sufficient specificity. Hence, appellee has established prejudice from prior counsel's actions.

Order affirmed.