**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Thomas BALENGER, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 6, 2000.
Filed March 28, 2001.

Shirley Novak, Pittsburgh, for appellant.

Sally K. Kaye, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before DEL SOLE, LALLY–GREEN and BROSKY, JJ.

BROSKY, J.

¶ 1 This is an appeal from an order denying Appellant's motion to dismiss charges on the basis of double jeopardy. Appellant raises one issue for our consideration which essentially asks whether principles of double jeopardy should prevent his re-prosecution where the prosecu- tor who prosecuted him was found to have been operating under an improper personal motive. After consideration, we affirm.

### *Procedural Background*

¶ 2 On November 8, 1987, William F. Martin was robbed at gunpoint at his residence at 105 Marshall Drive, in the Mount Lebanon section of Pittsburgh. The perpetrators absconded with $70,000 in cash and jewelry. The case remained open until sometime in 1989, when Appellant and Christopher Grabowski were charged with the commission of the robbery and ultimately convicted of the charges in a jury trial. An unsuccessful direct appeal followed, rendering Appellant's conviction final.

¶ 3 On June 1, 1993, Appellant filed a PCRA petition. Included in that petition was the allegation that trial counsel was ineffective for failing to apprise the court of a romantic relationship between the Assistant District Attorney who had prosecuted him, William Jones, and Appellant's girlfriend, Lana Conte. Generally speaking, Appellant alleged that Jones had acted improperly in using Ms. Conte as an informant against him and in prosecuting him in an attempt to remove him as a competitor for Ms. Conte's affections.

¶ 4 After the hearing, the PCRA court found that Appellant had raised a meritorious issue. While the PCRA court concluded that Jones had not falsified or manufactured evidence against Appellant, it did find that "the prime motivation for this particular prosecution was the removal of a romantic competitor from the life of Mr. Jones." The court further concluded that counsel had been ineffective in failing to pursue this issue at trial. Consequently, Appellant was granted a new trial. The Commonwealth, dissatisfied with this result, appealed and a panel of this Court affirmed. *Commonwealth v. Balenger*, 704

A.2d 1385 (Pa.Super.1997). Allowance of appeal to the Supreme Court was sought, but ultimately denied. 556 Pa. 670, 727 A.2d 126 (1998).

¶ 5 After the Commonwealth's appeal had been denied, Appellant's case was scheduled for re-trial. However, prior to the start of trial, Appellant filed a motion to dismiss based upon double jeopardy grounds. Appellant's motion was denied by the Honorable David R. Cashman and the present appeal followed.

### Factual Background

¶ 6 In January, 1987, Appellant was paroled from a state sentence he was then serving. Shortly thereafter, a robbery occurred at the Katz 'N Kids store located in the Squirrel Hill neighborhood of Pittsburgh. Appellant ultimately came under suspicion for that crime and, in investigating that robbery, investigators focused on a woman living in Cleveland, Ohio, Lana Conte, as phone records indicated that she had an apparent connection to Appellant. Upon contacting Ms. Conte, it was learned that Ms. Conte had been romantically involved with Appellant since shortly after his release from prison. In fact, Appellant was apprehended and returned to Pennsylvania after his location in Maryland, where he had been hiding, was discovered by police through a wiretap placed on Ms. Conte's telephone.

¶ 7 Assistant District Attorney (ADA) William Jones was assigned to the Katz 'N Kids robbery prosecution. In the process of "working up" the case, Jones spoke with Ms. Conte several times. Jones concluded that Ms. Conte's testimony would be very helpful to the prosecution yet, pursuant to Conte's wishes, Jones hoped to avoid calling her as a witness. On December 7, 1988, with Ms. Conte regarded as a cooperative witness, the Commonwealth was able to secure Appellant's guilty plea to robbery in the Katz 'N Kids prosecution. Consistent with an applicable mandatory minimum sentence, a sentence of five-to-ten years imprisonment was imposed the same date.

¶ 8 On December 7, 1988, Ms. Conte contacted Jones and asked if she was needed as a witness. Jones responded that a guilty plea had been entered and, consequently, that she would not be needed. Ms. Conte indicated that she would like to talk to Jones anyway, and they met at Mitchell's Restaurant in downtown Pittsburgh as Jones had yet to eat that day. Sometime later the two left Mitchell's Restaurant and went to Costanzo's Restaurant, where they ended up staying for approximately seven hours. At Costanzo's restaurant, Ms. Conte remarked that Costanzo's had been one of Appellant's "victims." She then related to Jones what Appellant had told her about that robbery, as well as seven other robberies Appellant had admitted to committing, including the still unsolved Martin robbery. Jones took notes regarding Ms. Conte's revelations in anticipation of following up on the information.

¶ 9 Sometime after their initial meetings, Jones and Ms. Conte developed a romantic relationship despite the fact that Jones was married.[1] In fact, Ms. Conte accompanied Jones to an office Christmas Party that Christmas season. When Jones later told his wife, Lola, that he wanted to spend New Year's Eve with Ms. Conte, Lola ejected him from the house and instituted divorce proceedings.

---

1. While we have omitted details relating to the development of the relationship between Jones and Conte, as well as the disintegration of Jones' marriage to his wife, Lola, Lola Jones' testimony was highly relevant in the subsequent PCRA hearings.

¶ 10 Soon thereafter, Jones started to investigate the allegations Ms. Conte had made against Appellant. Jones' focus soon centered on the Martin robbery since Jones had a good working relationship with one of the Mount Lebanon police officers and since information Lana had provided proved to coincide with confidential information provided by the victim. Based on the ensuing investigation, the charges at issue herein were eventually instituted. Although the Martin case was initially assigned to another Assistant District Attorney, Jones successfully sought reassignment of the case to himself so that he could personally handle the prosecution of Appellant.

¶ 11 During the investigation, Grabowski, who was jailed at the time on an unrelated incident, was interviewed in connection with the Martin robbery. While he did not sign a written confession, Grabowski admitted to his and Appellant's involvement in the robbery. Grabowski told police that he was recruited by Appellant to assist in Mr. Martin's robbery and admitted taking cash and jewelry from the Martin home. His redacted confession was introduced at trial along with evidence that on November 17, 1987, Appellant had purchased a car using $6,100 in cash despite having no visible means of possessing that amount of cash.

¶ 12 Appellant and Grabowski were subsequently tried together in December, 1989, for the Martin robbery and convicted of one count each of burglary, robbery, theft by unlawful taking, unlawful restraint, and conspiracy. Appellant was sentenced on September 25, 1990, to thirteen to twenty-six years' imprisonment. On direct appeal, Appellant raised six issues, including the ineffective assistance of trial counsel, yet his conviction was affirmed. Later, when Appellant's appeal was unsuccessful, Appellant filed the previously mentioned PCRA petition.

¶ 13 Lola Jones testified at the PCRA hearings and proved to be an instrumental witness. Lola related various discussions that Jones and she had about Jones' relationship with Ms. Conte. According to Lola, Jones had told her that "he had to save Lana" and that he was Ms. Conte's "savior, her psychiatrist and her attorney." Jones supposedly said that he was "in love" with Ms. Conte and that he had "to put [Appellant] away forever to save Lana ." Lola also stated that early in the Jones–Conte relationship, Lola contacted one of Appellant's colleagues in the District Attorney's office. She told the colleague, also an Assistant District Attorney, that she was concerned that her husband was having an affair with the girlfriend of a convict. Lola stated that she and "everyone in the DA's office knew" that Jones was "trying to prosecute" Appellant. After considering the evidence, the PCRA court reached the conclusions outlined above and granted Appellant a new trial. Appellant's unsuccessful efforts to block re-prosecution have led to the current disposition.

### Discussion

■ ¶ 14 While the facts of the present case might make for a reasonably engrossing Hollywood offering, its dramatic value in the legal arena is considerably less. We would start our discussion with an acknowledgment that our decision should not be construed in any way as approving or condoning the practice of a prosecutor involving himself in a case under circumstances like those presented here. Given Mr. Jones' personal involvement with Ms. Conte in the present case, the matter should have been handled by other members of the Allegheny County District Attorney's Office. Nevertheless, when scrutinized, the prosecutorial "misconduct"

that occurred here is more an affront to the sensibilities of society in general than to Appellant personally. Moreover, we cannot conclude that this affront is so egregious as to require the extreme remedy of dismissal of the charges or a bar to re-prosecution. Indeed, this affront actually is more philosophical than practical or real.

¶ 15 To illustrate what is meant by the above let us put the present case in context, which can best be done by describing what has not happened to Appellant rather than to point out what has happened to him. Appellant has not asserted that he was falsely accused of, or "framed" for, a crime that he did not commit. Appellant does not assert that the interested parties bore false testimony against him or fabricated physical evidence against him. Appellant does not assert that exculpatory evidence was withheld from him by the prosecution that prevented him from receiving a fair trial or which might have led to an acquittal. Appellant does not assert that the Commonwealth intentionally sought the declaration of a mistrial so as to make him "run the gauntlet" of trial a second time, or to enhance their chances of obtaining a conviction in a second trial by getting a "dry run."[2] Nor does Appellant

assert that he was needlessly put through the rigors of trial to his emotional and financial detriment. Lastly, Appellant does not assert that he was encouraged or entrapped to commit a crime he would not have otherwise committed.

¶ 16 With the above types of misconduct eliminated, all Appellant can reasonably complain of[3] is the fact that the Assistant District Attorney that handled his prosecution had, in addition to professional obligations and motivations, a strong personal desire or motive for seeing Appellant further incarcerated. Indeed, the most damning criticism leveled by the PCRA court was that Appellant "had a right to have 'his case prosecuted by someone with his mind on the public purpose and not by an advocate whose judgment may be blurred by subjective reasons.'" *Commonwealth v. Balenger*, 704 A.2d 1385, 1389 (Pa.Super.1997) (quoting the PCRA court). Thus, when Appellant's argument is reduced to its essence, Appellant asserts that he should not be subjected to a retrial because of the prosecutor's strong personal/ulterior motive to see him convicted. However, in making this request Appellant appears to be asking us to

2. Indeed, it fully appears that due to the prosecutorial "misconduct" that occurred here, Appellant was subjected to a weaker case against him than if the misconduct had not "occurred," thereby increasing his chances of acquittal.

3. Appellant seems obsessed with the fact that Ms. Conte "turned on him" and provided the prosecution with valuable information regarding the robberies he had committed. However, Appellant's complaints are without any legal foundation. Although it might be considered Appellant's "bad luck" that his ex-paramour, with whom he had shared the details of his illegal activity, took a romantic interest with someone in the law enforcement community, it is simply that, Appellant's "bad luck." Appellant has no protected interest in

the information he shared with a paramour, just as he has no protected interest in information shared with any other person with whom he did not possess a recognized confidentiality privilege. The fact that Ms. Conte's allegiances changed, and she became inclined to divulge the incriminating information to law enforcement officials, provides no grounds for protection or relief. Nor is it much different than a circumstance seen in numerous criminal prosecutions in which someone close to the perpetrator's criminal conduct later betrays the perceived trust that existed between them by divulging that information to law enforcement agents or testifying against them at trial. If Appellant's complaint were deemed meritorious the usage of informants would essentially be negated.

broaden the law as it relates to a double jeopardy bar on re-prosecution due to prosecutorial "misconduct" or "over-reaching."

¶ 17 In *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), our Supreme Court set forth the relevant law. The Court stated "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.*, 615 A.2d at 325. In our case neither aspect is present. There is no indication that the "misconduct" complained of was intended to induce a request for a mistrial and, in fact, it did not induce such a request. Moreover, as indicated previously, there is no indication that Appellant received less than a fair trial and, indeed, he may have been subjected to a weaker case due to the prosecutor's personal involvement with a key witness. Thus, *Smith* does not seem to support Appellant's request.

¶ 18 Although there was a lack of *Smith* type misconduct here, it could be plausibly argued that the "conflict of interest"[4] that was presented here might require a bar to re-prosecution. Undoubtedly, from a perspective favorable to Appellant, the aspect of the case that has the most appeal involves certain considerations of the exercise of discretion and judgment that permeate the duties of the District Attorney. In the case of *Commonwealth v. Eskridge*, 529 Pa. 387, 604 A.2d 700 (1992), our Supreme Court found an impermissible "conflict of interest" when an individual was prosecuted for homicide by vehicle while driving under the influence at the same time a law firm in which the District Attorney was a partner was handling a civil suit against the accused on behalf of the victim's survivors. Even though the prosecution was assigned to an ADA who had no affiliation with the District Attorney's law firm, the Court found there to be an impermissible conflict as a conviction on the criminal charge would greatly enhance the civil litigation and the ADA would be subject to the District Attorney's control and supervision. The Court found a conflict because of the distinct nature of a criminal prosecutor who must exercise independent judgment in prosecuting a case and has the responsibility of a minister of justice and not simply that of an advocate. The Court further noted that a prosecutor "must abandon the prosecution if, in his professional judgment, justice will be promoted by doing so."

¶ 19 While considered in abstraction, certain of the above factors could arguably apply here, in reality it seems inconceivable that Jones' involvement adversely affected any exercise of judgment or discre-

---

4. In reality there was not a conflict of interest in this case but, more correctly stated, a coincident interest, albeit a questionable and/or improper interest. A true "conflict" of interest occurs when a party has **competing** professional and personal interests, each of which will be served by opposing results. If a prosecutor is asked to prosecute someone he would not wish to see convicted, a relative or friend, perhaps, or if the prosecution of someone will somehow have an adverse affect on the prosecutor's personal interests, he will be experiencing a "conflict" of interests. His professional obligation will be in conflict with his personal desire or feelings and thereby threaten, or at least call into question, the performance of his professional duties. In the present case, this circumstance was not present. Indeed, Jones' personal desire to see Appellant incarcerated coincided with his professional responsibility thereby providing additional motivation to perform his duties to the best of his abilities.

tion on the part of the District Attorney's Office. First, unlike in *Eskridge*, here Jones was not the District Attorney but rather only an Assistant District Attorney. It seems rather unlikely that in a District Attorney's Office the size of Allegheny County's,[5] decisions on whether an individual will be prosecuted or not would be made by an ADA, particularly when the individual has been implicated in the commission of numerous robberies and has a lengthy criminal past. Thus, while Jones may have been able to manipulate the assignment of the prosecution of Appellant to himself, it seems rather unlikely that the decision to prosecute Appellant for the Martin robbery was made by him or unduly influenced by him.[6] Second, with respect to the exercise of any discretion in such matters, it appears that Appellant received as favorable a treatment as might reasonably be expected in that although Ms. Conte implicated him in numerous robberies, he ultimately stood trial for only one of them, the Martin robbery. The decision to pursue only one conviction may well have been the result of pragmatism, but it is virtually inconceivable that, given the information provided by Lana Conte, Appellant would have escaped prosecution altogether but for the intervention of Jones.[7] Moreover, we can conceive of no circumstance in which justice would have been served by allowing an individual implicated in the commission of several robberies a "pass" on all of them.

¶ 20 Since Appellant can not point to experiencing any "real prejudice" from Jones' assumption of the prosecution, the only remaining justification for barring reprosecution would be, like in matters involving search and seizure violations, to deter the reoccurrence of similar conflicts of personal and professional motivation in the future. First, we would assert that, given the lack of a demonstrable "real prejudice" to Appellant, the granting of a new trial should provide sufficient punishment/disincentive to the District Attorney's Office. Had Jones' withheld exculpatory evidence, or fabricated evidence against Appellant, the remedy requested would seemingly be appropriate.[8] Here we believe that the remedy granted below was sufficient to serve the deterrence interest in question.

¶ 21 Second, while we acknowledge the unethical nature of Jones' personal motivation in the present case, delving into the "personal motivation" of the prosecutor in a case is a tricky proposition and puts

---

5. The ADA representing the Commonwealth at the PCRA hearing estimated that the number of ADAs working in the Allegheny County District Attorney's Office exceeded 80.

6. Indeed, since Jones had the case reassigned to himself, it appears that a decision to prosecute Appellant for the Martin robbery had already been made. The record does not reflect whether Jones had any input in the original decision to charge Appellant with the Martin robbery.

7. Additionally, we would note that the remedy granted in *Eskridge* was a new trial, which is precisely what Appellant received here. Thus, even if an *Eskridge* type of conflict of interest is perceived, *Eskridge* does not mandate the remedy sought here.

8. *See Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), where our Supreme Court ordered an appellant discharged due to prosecutorial misconduct/overreaching. There the prosecutor essentially lied to defense counsel as to the existence of an agreement with a chief witness wherein the witness would testify in exchange for favorable sentencing treatment on unrelated convictions. Also the prosecutor withheld physical evidence that might have aided the defense. In so doing, the appellant had been denied a fair trial. This degree of misconduct was considered egregious enough to warrant a reversal and discharge, as opposed to the granting of a new trial.

courts squarely in the middle of the proverbial "slippery slope." Prosecutors are human and possess human traits like all other people. Many individuals are competitive by nature and highly motivated to "win," or to do their job well. Thus, some prosecutors might be "highly motivated" in their prosecutions for these reasons. Some might be readily "judgmental" about the objects of their prosecutions and develop a strong "ill will" toward them. Or some might be very empathetic toward a complainant and be strongly motivated to put a defendant away due to such empathy. In all these situations, the prosecutor might not be any less motivated to achieve a conviction than was Jones in the present case. Thus, the fact that Jones' personal interests would be served by Appellant's conviction alone does not indicate that he tried any harder to convict Appellant than would another prosecutor who was motivated simply by a desire to win or do his job well or one who developed a strong contempt for Appellant's felonious behavior.

¶ 22 Although ideally we would like all prosecutors to be operating on only the most "ethical" and neutral motivational bases, are we to vacate any conviction where a prosecutor's personal interests might be advanced as a result of the prosecution or who has a "personal desire" to see the accused convicted? Many prosecutors have gone on to a "higher office" or advanced their careers after prosecuting a "high profile" case that gets their name in the news media. Some, like those involved in the prosecution of high profile celebrity cases, might later write a book or screenplay about the experience thereby experiencing pecuniary gain. Undoubtedly some prosecutors are aware that a conviction in a certain case might advance their careers. Can the fact that a prosecutor is motivated by the potential benefits of prosecuting a particular case be used as a basis to nullify an ensuing conviction? In our opinion, as long as the motivational factor does not lead the prosecutor to "step over the line" and engage in improper conduct, we think the answer to the above rhetorical questions must be "no."

¶ 23 Based upon the above discussion, we conclude that a retrial of Appellant does not offend the concepts of double jeopardy, as such, Appellant is not entitled to a bar to re-prosecution. Consequently, the court properly denied Appellant's motion to dismiss on double jeopardy grounds.

¶ 24 Order affirmed.

¶ 25 LALLY–GREEN, J., concurs in the result.