IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD L. ABBOTT, | § | |
| | § | |
| Plaintiff Below, | § | No. 155, 2018 |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| DELAWARE STATE PUBLIC | § | C.A. No. N16A-09-009 FWW |
| INTEGRITY COMMISSION, | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: February 20, 2019
Decided: February 25, 2019

Before **STRINE**, Chief Justice; **VAUGHN**, **SEITZ**, **TRAYNOR**, Justices; and **NEWELL**, Chief Judge,[*] constituting the Court *en Banc*.

*PER CURIAM:*

**O R D E R**

After consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)    The appellant and plaintiff below, Delaware attorney Richard L. Abbott, filed this appeal from a Superior Court opinion, dated February 28, 2018, affirming the Delaware State Public Integrity Commission's dismissal of his complaint.[1]  We hold that in determining that Abbott's complaint failed to state a

---

[*] Sitting by designation under Del. Const. art. IV, § 12.
[1] *Abbott v. Del. State Pub. Integrity Comm'n*, 2018 WL 1110852 (Del. Super. Ct. Feb. 28, 2018).

violation, the Commission did not exceed its jurisdiction, proceed illegally or manifestly contrary to law, or proceed irregularly. We therefore affirm the Superior Court's judgment.

(2) The origins of this litigation lie in a Court of Chancery action captioned *Seabreeze Homeowners Assoc., Inc. v. Marshall Jenney*, C.A. No. 8635-VCG.[2] In June 2013, Seabreeze Homeowners Association, Inc. filed a complaint for specific performance of a 2012 settlement agreement in which the property owner had agreed to trim trees and shrubs on his properties in the subdivision.[3] In July 2014, the Court of Chancery entered a consent order requiring the property owner to take certain actions for the trimming of the shrubs.[4] In November 2014, Seabreeze moved for a rule to show cause, alleging that the property owner had failed to perform.[5] The Vice Chancellor ruled that the property owner, who was represented by Abbott, had breached the consent order.[6] The Vice Chancellor encouraged the parties to work together and file a stipulation for the necessary shrub trimming.[7]

---

[2] App. to Opening Br. at A57–80. These facts are taken from Abbott's complaint and exhibits before the Commission. *See Maddrey v. Justice of Peace Court 13*, 956 A.2d 1204, 1216 (Del. 2008) (recognizing that record for review of *certiorari* proceeding consists of "the complaint initiating the proceeding, the answer or response (if required), and the docket entries").

[3] App. to Opening Br. at A68.

[4] *Id.* at A69.

[5] *Id.*

[6] *Id.*

[7] *Id.*

2

(3)     On March 16, 2015, Abbott informed the Vice Chancellor that, other than pending requests for attorneys' fees, the action was moot because the property owner had transferred the properties to his wife, which meant he no longer had an ownership interest and was relieved of his obligations under the Settlement Agreement.[8]  Seabreeze renewed a motion for a rule to show cause hearing, arguing that the transfer was a sham transaction designed to evade a court order.[9]  At the hearing, the Vice Chancellor ruled:

> But despite having done many, many, many homeowners cases, I have never had a defendant in one of those cases sit in a witness chair and tell me that he didn't intend to comply with his agreement because he was upset with his neighbors and he might want to sell the property.  Nor have I ever had anybody sit in a witness chair and tell me that on advice of counsel, he had entered into a sham transaction to frustrate the specific performance of any agreement.  It is shocking to me.  It is unacceptable.  It is unacceptable behavior for a litigant in this Court.  It is unacceptable behavior for an attorney in this Court.  So it's clear to me there was contempt of my bench order and of the stipulation and order of this Court.[10]

---

[8] *Id.* at A69–70.
[9] *Id.* at A70.
[10] *Id.* at A70–71.

The Vice Chancellor suspended the rule to show cause hearing and ordered that it would be reconvened when the parties met on the properties to determine which shrubs would be trimmed.[11]

(4) On May 21, 2015, after the site visit, the rule to show cause hearing resumed.[12] The Vice Chancellor noted that he had previously found "it both contemptuous of this Court, contemptuous of the order of this Court, and a blatant, blatant example of vexatious litigation to undergo a sham transfer of the property solely to avoid enforcement of a court Order."[13] After awarding Seabreeze its costs and fees, the Vice Chancellor stated:

> My question here today really is should that be borne by the defendant or should it be borne by counsel who advised his client to take an action that so clearly, in my mind, represents purely vexatious litigation tactics. I think I will leave that to the client and the attorney to figure out.[14]

On June 10, 2015, the Vice Chancellor referred Abbott to the Office of Disciplinary Counsel ("ODC").[15] The ODC opened an investigation into Abbott's conduct.[16]

(5) On July 22, 2016, Abbott filed a complaint against Jennifer-Kate Aaronson, then Chief Disciplinary Counsel, with the Commission.[17] He alleged that

---

[11] *Id.* at A71.
[12] *Id.*
[13] *Id.* at A71–72.
[14] *Id.* at A72.
[15] *Id.* at A80.
[16] *Id.* at A57–66.
[17] *Id.* at A57–80.

4

Aaronson had violated the appearance of impropriety standard in Section 5806(a) of the States Employees', Officers' and Officials' Code of Conduct (the "State Ethics Code").[18] Abbott alleged that Aaronson had violated the State Ethics Code by: (i) declining to recuse herself in the ODC proceeding; (ii) pursuing "an out-and-out fishing expedition" at the request of the Vice Chancellor in order to advance her own judicial ambitions; (iii) having improper *ex parte* communications with the Chief Justice to obtain confidential Court on the Judiciary documents in furtherance of her "fishing expedition"; and (iv) filing a motion to compel the production of privileged documents.[19] The attachments to the complaint included Abbott's July 8, 2016 letter to Aaronson demanding that she recuse herself from his ODC matter, Aaronson's July 13, 2016 letter in response, the ODC's July 13, 2016 motion to compel Abbott's communications with his client about the transfer of the properties, and the Court of Chancery's June 10, 2015 letter referring Abbott to the ODC.[20]

(6)    In a decision dated August 24, 2016, the Commission dismissed Abbott's complaint.[21] Based on Aaronson's status as a lawyer subject to this Court's regulation and oversight of the legal profession, the separation of powers doctrine, and the alleged misconduct, the Commission concluded that it lacked authority over

---

[18] *Id.* at A57.
[19] *Id.* at A57–60.
[20] *Id.* at A65–80.
[21] *Id.* at A81–84.

5

Aaronson.[22] The Commission also found that, even if it had authority over Aaronson, Abbott failed to allege adequately a violation of the State Ethics Code.[23] According to the Commission, Abbott's allegation that two of three previous Chief Disciplinary Counsel became judges did not mean Aaronson shared similar aspirations or that such aspirations would affect her professional judgment.[24] The Commission also determined that Abbott failed to allege any facts to support a conclusion that an appearance of impropriety existed among the public.[25]

(7) On September 21, 2016, Abbott filed a complaint for a writ of *certiorari* and declaratory judgment in the Superior Court. The Commission subsequently amended its decision to include additional grounds for dismissal. Abbott amended his complaint to include the amended decision. After briefing and oral argument, the Superior Court affirmed the Commission's decision.[26]

(8) The Superior Court limited its review to the Commission's original decision, finding that once Abbott filed his complaint in the Superior Court the Commission was divested of jurisdiction and could not amend its decision.[27] The Superior Court next held that the Commission did not err by declining to exercise jurisdiction over Aaronson because administrative agencies generally "can

---

[22] *Id.* at A82–83.
[23] *Id.* at A83.
[24] *Id.*
[25] *Id.*
[26] *Abbott*, 2018 WL 1110852, at *6.
[27] *Id.* at *3–4.

determine their own jurisdiction in the first instance."[28]  The Superior Court then held that the Commission did not commit an error of law in concluding that it lacked jurisdiction over Aaronson.[29]  The Superior Court agreed with the Commission that Aaronson, as an attorney and Chief Disciplinary Counsel, was subject to this Court's regulation and authority and the Commission could not "interject itself into what is exclusively the Supreme Court's domain."[30]  Finally, the Superior Court concluded that the Commission did not commit an error of law in concluding that Abbott's complaint failed to state a violation of the State Ethics Code.[31]  This appeal followed.

(9)     Because Abbott had no right of appeal from the Commission's decision under the State Ethics Code, he sought *certiorari* review.[32]  The purpose of a writ of *certiorari* is "to permit a higher court to review the conduct of a lower tribunal of record."[33]  A writ of *certiorari* is not a substitute for a direct appeal.[34]  "A *certiorari* proceeding differs fundamentally from an appeal in that the latter brings the case up on its merits while the . . . (former) brings up the record only so that the reviewing court can merely look at the regularity of the proceedings."[35]  The record for review

---

[28] *Id.* at *4.
[29] *Id.* at *4–5.
[30] *Id.* at *5.
[31] *Id.* at *5–6.
[32] 29 *Del. C.* § 5810A (limiting right of appeal to person found to have violated State Ethics Code).
[33] *Christiana Town Ctr., LLC v. New Castle Cnty.*, 2004 WL 2921830, at *2 (Del. Dec.16, 2004) (citing *Shoemaker v. State*, 375 A.2d 431, 436-37 (Del. 1977)).
[34] *Black v. New Castle Cnty. Bd. of License*, 117 A.3d 1027, 1030 (Del. 2015).
[35] *Shoemaker*, 375 A.2d at 437 (internal quotation marks omitted).

is "limited to the complaint initiating the proceeding, the answer or response (if required), and the docket entries."[36] When reviewing on a writ of *certiorari*, a court is "limited to determining based on that limited record whether the lower tribunal: '(i) exceeded its jurisdiction;' (ii) 'proceeded illegally or manifestly contrary to law'; or (iii) 'proceeded irregularly.'"[37]

(10) Abbott first argues that the Superior Court erroneously failed to address the declaratory judgment claim alleged in his complaint. Abbott's declaratory judgment claim asked the Superior Court to declare that the Commission committed legal error by: (i) determining that it could not exercise jurisdiction over Aaronson and the ODC; (ii) determining that Abbott had not stated sufficient facts to support an appearance of impropriety claim; and (iii) issuing an amended decision. But the Superior Court addressed each of those claims of legal error when addressing the substance of the Commission's decision.[38] Separately analyzing Abbott's declaratory judgment claim would have been duplicative. There is thus no basis for reversal on this issue.

---

[36] *Maddrey v. Justice of Peace Court 13*, 956 A.2d 1204, 1216 (Del. 2008).

[37] *Black*, 117 A.3d at 1031 (quoting *Christiana,* 2004 WL 2921830, at *2).

[38] *See Abbott*, 2018 WL 1110852, at *4–5 (holding that the Commission correctly determined that it could not exercise jurisdiction over Aaronson and the ODC); *id.* at *5 (holding that the Commission did not err by concluding that Abbott had not sufficiently alleged an appearance of impropriety); *id.* at *3–4 (holding that the Commission was divested of jurisdiction to issue the Amended Decision upon the filing of the Superior Court action).

8

(11) Abbott next argues that the Commission committed legal error in concluding that it lacked jurisdiction over Aaronson based on her status as an attorney who is subject to this Court's disciplinary oversight. The Commission argues its exercise of jurisdiction over Aaronson would violate the constitutional doctrine of the separation of powers. It is unnecessary to address this issue because, as discussed below, we find that the Commission did not commit manifest legal error in concluding that Abbot's complaint failed to state a violation of the State Ethics Code. This Court will not decide a constitutional question unless "its determination is essential to the disposition of the case."[39]

(12) Abbott's last argument on appeal is that the Commission committed legal error in finding he failed to allege adequately that Aaronson violated 29 *Del. C.* § 5806(a). We hold that it was not manifestly contrary to law for the Commission to determine that Abbott's complaint did not state a violation of the State Ethics Code.

(13) The Commission may "dismiss any complaint that it determines is frivolous or fails to state a violation."[40] Under Section 5806(a) of the State Ethics Code, State employees must "endeavor to pursue a course of conduct which will not raise suspicion among the public that such state employee, state officer or honorary

---

[39] *Downs v. Jacobs*, 272 A.2d 706, 708 (Del. 1970).
[40] 29 *Del. C.* § 5809(3).

9

state official is engaging in acts which are in violation of the public trust and which will not reflect unfavorably upon the State and its government." The parties agree that this is an appearance of impropriety standard. The Commission has described the test for an appearance of impropriety as whether "the conduct would create in reasonable minds, with knowledge of all relevant facts, a perception that an official's ability to carry out her duties with integrity, impartiality and competence is impaired."[41]

(14) Abbott complains that the Commission did not address all of the allegations in his complaint, but in fact the Commission correctly recognized the gravamen of his complaint. Abbott's logic was stark and went like this. In the years before the Court of Chancery referred Abbott's conduct in the *Seabreeze* litigation for investigation by the ODC, two previous Chief Disciplinary Counsel had become judges. Aaronson had herself applied for a judicial position. Based on this, Abbott contends that Aaronson had a desire for judicial office. Because the referring Vice Chancellor was a judicial officer, Aaronson would, in Abbott's view of the world, somehow naturally advantage herself by determining that Abbott had engaged in professionally inappropriate behavior and thus in seeking sanctions against him to be imposed by the Board on Professional Responsibility ("BPR").

---

[41] *Hanson v. Del. State Pub. Integrity Comm'n*, 2012 WL 3860732, at \*16 (Del. Super. Ct. Aug. 30, 2012), *aff'd*, 69 A.3d 370 (Del. 2013) (TABLE).

(15) In so arguing, Abbott does not allege any facts suggesting that Aaronson had any personal relationship with the Vice Chancellor or any personal motive to disfavor Abbott himself. Likewise, Abbott does not allege that the referring Vice Chancellor had any role at all in the nomination or confirmation process used by the Governor and Senate for the selection and seating of judicial officers. There are approximately sixty judges serving on Delaware courts other than the Justice of the Peace Court. Abbott makes no attempt to show the referring trial judge had any special sway with the Judicial Nominating Commission, the Governor, or the Senate. Nor does Abbott allege that the referring judge had ever involved himself in any judicial appointment process that did not involve his own personal candidacy. In sum, all that Abbott argues is that Aaronson had a desire to become a judge, that each of the five dozen judges in the state have influence over who gets appointed to judicial vacancies, and that she would therefore view a successful prosecution of Abbott as pleasing to the referring judge and thus as advancing her judicial hopes.

(16) The Commission's determination that these allegations do not state a violation of the State Ethics Code was not manifestly contrary to law. For starters, we note that the circumstances of Aaronson's involvement in investigating Abbott are themselves benign. In some situations, the ODC is itself the initiator of an investigation, when it happens upon information that provides a basis to suspect that

11

a lawyer has violated the Lawyers' Rules of Professional Conduct. Here, however, neither the ODC nor Aaronson was the motivating force in inspiring the ODC's investigation of Abbott. Instead, the ODC received a formal referral from a Vice Chancellor of our Court of Chancery, a referral that was put on the record by the referring judge and that involved facially reasonable grounds for suspecting that Abbott might have breached the Rules of Professional Conduct. The mere fact that the Vice Chancellor made the referral does not imply that he desired any particular outcome in the matter. Judges are supposed to take action when they become aware of a likelihood of unprofessional conduct by a lawyer.[42] Abbott also ignores another factor. The Vice Chancellor did not sanction Abbott as he could have done if he wished to impose his own ultimate judgment on Abbott's conduct. He instead referred the matter to the ODC so it could investigate and only subject Abbott to sanction if the BPR agreed that sanctions were warranted. And the fact that Aaronson proceeded to investigate also does not imply that she was personally targeting Abbott. As Chief Disciplinary Counsel, Aaronson was required to "screen and evaluate all information coming to the attention of the Office relating to conduct by a lawyer and/or the practice of law in the State of Delaware" and "[i]nvestigate when necessary or appropriate all information coming to the attention of the Office

---

[42] Del. Judges' Code of Judicial Conduct R. 2.15 ("A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer.").

12

which might be grounds for discipline or other action regarding the practice of law in the State of Delaware."[43]

(17) Abbott notably does not allege any facts suggesting that Aaronson had a personal bias against Abbott or in favor of the Vice Chancellor that would affect the impartiality of her investigation. He does not allege, for example, that Aaronson sought the assignment of the Vice Chancellor's referral to herself so she could pursue a matter in which she had a personal interest,[44] that she had a personal relationship with anyone in the matter,[45] or that she had any personal interest in the relevant proceedings.[46] Abbott also ignores the reality that Aaronson represents only one side of the matter, and that the process for attorney discipline has extensive procedural due process protections for parties like him, including the ability to

---

[43] Supr. Ct. R. 64(e)(1), (e)(2).

[44] *See, e.g., Stevenson v. State*, 782 A.2d 249, 251–57 (Del. 2001) (holding that trial judge's contact with the murder victim and undisclosed request for assignment of the murder cases to him before indictment created an appearance of impropriety).

[45] *See, e.g., Wright v. United States*, 732 F.2d 1048, 1055 (2d Cir. 1984) ("We find it hard to deny that the decision, after one grand jury investigation of the BRL transaction had terminated without the prosecutor's seeking an indictment, to assign Wright's case for further investigation to a prosecutor whose wife was not merely a political opponent of Wright's but a lawyer who had on two occasions brought complaints to federal authorities that could have resulted in criminal charges against him, who had actively petitioned various federal, state and local agencies to investigate Wright's alleged misdeeds, who had allegedly been assaulted by Wright's minions, and who almost certainly harbored personal animosity against Wright, created an appearance of impropriety.").

[46] *See, e.g., Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 805–06 (1987) (concluding that appointment of counsel for an interested party to bring a criminal contempt prosecution created an appearance of impropriety); *People v. Zimmer,* 414 N.E.2d 705, 708 (N.Y. 1980) (holding that the prosecutor, who was counsel to and stockholder in the corporation that the defendant was alleged to have harmed should have recused himself).

appeal any determination of the BPR to this Court.[47]  Instead, Abbott relies solely on Aaronson's alleged desire to be a judge.

(18)  This Court has rejected the notion that career goals alone create an appearance of impropriety in the context of judicial recusals.  In *Capano v. State*, we held that without identification of discrete instances in which the judge's exercise of discretion may have been "motivated by political ambitions," allegations that a judge had plans to run for election as Governor did not create an inference that the judge could not act impartially in a highly publicized trial.[48]  Similarly, the existence of past professional relationships between judges and litigants do not by themselves create an appearance of impropriety.[49]

(19)  Ultimately, Abbott's argument proves too much.  By his logic, every Delaware prosecutor or regulator who aspires to a higher office (be it as a judge, elected official, or cabinet position) and strives to do a good job would be violating the State Ethics Code by ingratiating themselves with potential sources of referral who have positions of stature in our community.  As to ambition for judgeships in particular, Abbott's logic essentially boils down to this: anything someone does that a sitting judge supposedly wants will naturally advantage that person in seeking a

---

[47] *See, e.g.,* Del. Lawyers' Rules of Disciplinary Procedure 9(e) (providing for this Court's review of the BPR's final report and any objections by the ODC or respondent).

[48] 781 A.2d 556, 641–43 (Del. 2001).

[49] *See, e.g.*, *Madison v. State*, 133 A.3d 200, 2016 WL 363734, at *2 (Del. Jan. 28, 2016) (TABLE) (rejecting the defendant's claim that the trial judge's past supervision of the prosecutor showed bias and created an appearance of impropriety).

judgeship for herself. This is not sensible and ignores how the judicial appointment process in Delaware actually works. A person who seeks a judicial position must run the gantlet of recommendation by the Judicial Nominating Commission, nomination by the Governor, and confirmation by a majority of the Senate.[50] Sitting judges do not determine judicial appointments, and as we have noted, Abbott does not indicate that the referring trial judge had any special influence over judicial nomination or confirmation or desired any particular outcome with respect to the disciplinary referral.

(20) Abbott's other grounds for asserting a claim under the State Ethics Code do not undermine the Commission's conclusion. Abbott's suggestion that Aaronson must have engaged in improper conduct because the Vice Chancellor's referral failed to identify specific wrongdoing is contradicted by the Court of Chancery's June 10, 2015 referral letter, which was attached to Abbott's complaint. The first sentence of the letter refers to the Court of Chancery's May 21, 2015 bench ruling, in which the Vice Chancellor stated that the issue before him was a sham transfer of property, on the advice of counsel, to avoid a court order.[51]

(21) Similarly, Abbott's contention that Aaronson had *ex parte* contact with a member of this Court to obtain confidential Court on the Judiciary documents

---

[50] Governor's Executive Order 7 (Mar. 9, 2017); Del. Const. art. IV, § 3.
[51] *See supra* ¶ 4.

requires an inferential leap that is not supported by any facts alleged in the complaint. The only specific fact alleged in the complaint is that the Court on the Judiciary issued an order waiving certain confidentiality restrictions for Court on the Judiciary proceedings.[52] But the fact that an order was issued does not support a reasonable inference that Aaronson engaged in impermissible *ex parte* communications. The more logical inference here is that Aaronson contacted the Clerk of the Court on the Judiciary to ask for access to the records, the complained-of judicial officer authorized a waiver of confidentiality, the Clerk prepared an appropriate order, and the Court signed the order. Indeed, that is precisely what the order denying Abbott's motion to disqualify describes as having happened.[53] Accordingly, it was not manifestly contrary to law for the Commission to conclude that these allegations did not state a violation of the State Ethics Code.

(22) In speculating that there were improper *ex parte* communications, Abbott also ignores that the confidentiality of Court on the Judiciary proceedings may be waived as ordered by the Court "on request of the judicial officer involved."[54] As this language reflects, the confidentiality of the Court on the

---

[52] App. to Opening Br. at A63 ("[T]he first time I was aware of your improper communications . . . was when a surprise Order was issued, which was not preceded by any Motion and opportunity for me to be heard. Such actions smack of improper 'insider' communications and influence that is in and of itself sufficient to make the public suspicious of your motivations and actions.").

[53] *Abbott v. Del. State Pub. Integrity Comm'n*, No. 155, 2018 (Order Denying Motion for Recusal) (Del. Feb. 25, 2019).

[54] Court on the Judiciary R. 17.

Judiciary proceedings is intended to protect a judge,[55] not a complainant like Abbott. Improper *ex parte* communications, by contrast, involve contact with a judge on substantive matters concerning the merits of an issue pending before the court.[56] Any communication that was necessary to effect the confidentiality waiver did not relate to a substantive matter concerning the merits of an issue pending in the case.[57] This further supports the Commission's conclusion that Abbott's allegations regarding purported *ex parte* communications do not state a violation of the State Ethics Code.

---

[55] *Id.*

[56] *See Yost v. Johnson*, 591 A.2d 178, 182 (Del. 1991) ("A judge should not engage in a substantive *ex parte* communication concerning the merits of an issue pending before the court.").

[57] *E.g., In re Adbox, Inc.*, 2007 WL 816503, at *1 (9th Cir. Mar. 14, 2007) (holding that several *ex parte* contacts between a party's counsel and the judge and his law clerk did not warrant recusal because the "communications related to purely procedural matters"); *Liberty Mutual Ins. Co. v. Commercial Concrete Sys., LLC*, 2017 WL 1234140, at *5-6 (N.D. Fla. Apr. 1, 2017) (explaining that contact between parties' counsel and the judge or the judge's staff for scheduling, administrative, or emergency purposes is unobjectionable, and citing cases); *Eleanora J. Dietlin Trust v. Am. Home Mortgage Inv. Corp.*, 2014 WL 911121, at *2–3 (D. Nev. Mar. 7, 2014) (denying motion for recusal where a non-party interested party communicated with the judge about the status of a settlement of the case, because the contact was for administrative purposes and there was no substantive discussion about the case); *In re Marriage of Herum*, 2018 WL 4635908, at *3 (Ia. Ct. App. Sept. 26, 2018) (concluding that *ex parte* "procedural conferences with court administration concerning scheduling and judicial case assignment" were not improper); *Patterson v. STHS Heart, LLC*, 2018 WL 4091633, at *4 (Tenn. Ct. App. Aug. 28, 2018) (holding that recusal of a judge was not required where the judge's law clerk contacted the plaintiff's counsel to request a draft order because the communication did not create an appearance that the court was biased or prejudiced, particularly where the argument for recusal was "based more on insinuation and speculation than on actual facts"); *Costalas v. Amalfitano*, 23 A.D.3d 303, 303–04 (N.Y. App. Div. 2005) (holding that *ex parte* communication by a party's counsel with the judge did not warrant vacatur of judgment because the court had already decided to dismiss the action when the communication occurred and the communication did not concern the merits of the case).

17

(23)   More fundamentally, the Commission did not commit a manifest error in law in concluding that Abbott's allegations of *ex parte* communications fail to state a violation because *ex parte* communications in a matter pending before a state tribunal are not the type of misconduct that the State Ethics Code is designed to cover.  The State Ethics Code is ultimately about ensuring there is no "violation of the public trust,"[58] such as when a public official has a specific financial or personal interest in the outcome of the matter.[59]  Allegations of *ex parte* communications between a lawyer and judge, by contrast, are more appropriately resolved through the BPR and the Lawyers' Rules of Professional Conduct, which contain a rule that specifically prohibits such communications.[60]  Although we do not hold that government lawyers can never run afoul of the State Ethics Code, when that alleged

---

[58] 29 *Del. C.* § 5806(a); *see also id.* § 5802(1) ("In our democratic form of government, the conduct of officers and employees of the State must hold the respect and confidence of the people.  They must, therefore, avoid conduct which is in violation of their public trust or which creates a justifiable impression among the public that such trust is being violated.").

[59] *See, e.g.*, *Commonwealth v. Eskridge*, 604 A.2d 700, 701–02 (Pa. 1992) (holding that a conflict of interest barred prosecution where the prosecutor "had a direct financial interest in obtaining a conviction" because his private law partners represented individuals suing the defendant in a separate civil action over the events at issue in the prosecution); *Commonwealth v. Balenger*, 704 A.2d 1385, 1389–90 (Pa. Super. Ct. 1997) (holding that the prosecutor's romantic relationship with the defendant's former girlfriend created an impermissible conflict of interest that required a new trial).

[60] Del. Lawyers' Rules of Professional Conduct R. 3.5(b) ("A lawyer shall not . . . communicate . . . ex parte with [a judge, juror, prospective juror, or other official or member of such person's family] during the proceeding unless authorized to do so by law or court order . . . ."). *See, e.g.*, *La. State Bar Ass'n v. Harrington*, 585 So.2d 514, 520–22 (La. 1990) (resolving allegations of *ex parte* communications between a lawyer and judge under the Louisiana Rules of Professional Conduct); *In re Disciplinary Proceedings Against McGrath*, 308 P.3d 615, 624 (Wash. 2013) (same under the Washington Rules of Professional Conduct).

misconduct of a state employee directly relates to the way that a lawyer has conducted herself before a tribunal, the standard governing the lawyer's conduct is likely to instead be supplied by the Lawyers' Rules of Professional Conduct, and any violation of those rules should be addressed by that tribunal or the BPR.

(24) Abbott's last allegation against Aaronson is that she moved to compel the production of documents from him that he claims are subject to the attorney–client privilege—namely, client correspondence and communications related to the transfer of Abbott's client's properties to his wife.[61] In the normal course, Abbott would have just objected to the BPR and sought to block the discovery. As with his *ex parte* communications claim, it was not manifestly contrary to law for the Commission to conclude that this type of conduct is not what the State Ethics Code is designed to address. Regulation of that type of misconduct falls squarely within the jurisdiction of the tribunal before which the parties are appearing and, ultimately, this Court's "inherent and exclusive authority to discipline members of the Delaware Bar" for violations of the Rules of Professional Conduct.[62] As the Commission recognized, if Abbott opposed the motion to compel or thought Aaronson should be

---

[61] *See* App. to Opening Br. at A-41 (requesting "all documents that evidence, relate or refer to client correspondence and/or communications involving the transfer of 317 Salisbury Street and 318 Salisbury Street, Rehoboth, Delaware").

[62] *E.g.*, *In re Abbott*, 925 A.2d 482, 484 (Del. 2007) (quoting *In re Froelich*, 838 A.2d 1117, 1120 (Del. 2003)); *accord In re Pelletier*, 84 A.3d 960, 962 (Del. 2014).

disqualified, he had recourse in the BPR.[63]  Moreover, disputes over whether documents are protected by the attorney–client privilege are common in litigation and do not inherently bring into question a lawyer's integrity, impartiality, or competence.

(25)  Underlying all of Abbott's complaint is his belief that he should not be under disciplinary investigation, and that the person charged with that task should be disqualified for performing it.  But Delaware law is clear that motions to disqualify an adversary are not to be lightly granted, as they present an obvious potential for abuse.[64]  No litigant likes to be subject to a claim, but that does not justify disqualifying the attorney on the other side of the "v."  And our law makes plain that even if the lawyer on the other side engages in problematic behavior, the complaining party should first undertake lesser steps, such as those we have discussed, to address that behavior, and not take the stark step of seeking disqualification.  Those principles further underscore that the Commission did not

---

[63] Del. Lawyers' Rules of Disciplinary Procedure R. 12(f) ("Disputes concerning the scope and other aspects of the limited discovery afforded under these Rules shall be heard and determined by the Chair or Vice Chair of the Board, unless a Hearing Panel has been assigned to the matter, in which case such disputes shall be heard and determined by the chair of the Hearing Panel.").
[64] *See, e.g.*, *Dunlap v. State Farm Fire & Ins. Cas. Co.*, 950 A.2d 658, 2008 WL 2415043, at *1 (Del. 2008) (TABLE) (recognizing that motions to disqualify opposing counsel are generally disfavored); *In re Waters*, 647 A.2d 1091, 1095 (Del. 1994) (discussing the risk of tactical abuse posed by motions to disqualify); *Seth v. State*, 592 A.2d 436, 443 (Del. 1991) ("The Rules [of Professional Conduct] may not be used for tactical purposes to disqualify prosecutors where no realistic likelihood of conflict appears.").

commit a manifest error of law in concluding that the gravamen of Abbott's complaint does not state a well-pleaded claim of bias or appearance of impropriety.[65]

(26)  Not only was it not a manifest error of law for the Commission to conclude that this type of litigation-specific conduct by a lawyer did not violate the State Ethics Code, but the Commission was also well within its discretion in declining to use its limited enforcement resources to address conduct that was already subject to review of the tribunal in which the conduct occurred, and also by the BPR if that conduct was made the subject of a complaint to that body.  By statute, the Commission is entitled to "dismiss any complaint *that it determines* is frivolous or fails to state a violation."[66]  The General Assembly's decision to allow the Commission to dismiss not only a complaint that "fails to state a violation," but also a complaint that the Commission "*determines* is frivolous or fails to state a violation,"[67] suggests that the General Assembly intended to imbue the Commission with discretion in deciding whether to refer an alleged violation for further investigation.  Indeed, that is consistent with the traditional maxim that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[68]  In essence, the

---

[65] *See, e.g.*, *Gattis v. State*, 955 A.2d 1276, 1284 (Del. 2008) (recognizing that a judge's adverse rulings or critical remarks do not ordinarily support a bias or appearance of impropriety claim).
[66] 29 *Del. C.* § 5809(3) (emphasis added).
[67] *Id.* (emphasis added).
[68] *E.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

21

Commission's decision in this case was a decision not to pursue enforcement action. As the United States Supreme Court has recognized, such a decision "often involves a complicated balancing of a number of factors," including not only "whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all."[69] Here, the Commission's decision reflects a consideration of those factors, including a desire not to bring enforcement actions related to "attorney conduct *as it relates to the practice of law*."[70] The Commission reasoned that such an enforcement action was unnecessary in part because "courts are willing to enforce those rules, including conduct which creates an appearance of impropriety, as alleged in this matter."[71]

(27) Stripped of its colorful adjectives, Abbott's complaint in the Commission essentially alleged that Aaronson had future career goals while performing her job as Chief Disciplinary Counsel. Recognizing the gravamen of Abbott's complaint, the Commission determined that he failed to allege any facts supporting a public perception of impropriety by Aaronson. Under these circumstances, the Commission did not commit a manifest error of law when it found

---

[69] *Id.*
[70] App. to Opening Br. at A-47 (emphasis in original).
[71] *Id.*

22

Abbott failed to state a violation of the State Ethics Code, and it acted within its discretion in dismissing his complaint.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is hereby AFFIRMED.