**[J-6-2025] [MO:Dougherty, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. 32 EM 2023 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | [Intermediate Court] Court at of the |
| | : | Philadelphia County Court of |
| | : | Common Pleas at No. CP-51-CR- |
| LAVAR BROWN | : | 0407441-2004 dated |
| | : | |
| | : | ARGUED: March 5, 2025 |
| PETITION OF: FAMILY MEMBERS OF | : | |
| MURDER VICTIMS MICHAEL | : | |
| RICHARDSON AND ROBERT CRAWFORD | : | |

## CONCURRING OPINION

**JUSTICE McCAFFERY**                    **DECIDED: June 16, 2026**

*"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes the lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of criminal law the end justifies the means — to declare that the Government may commit crimes in order to secure the conviction of a private criminal — would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."*

- *Olmstead v. U.S.*, 277 U.S. 438, 485 (1928) (Brandeis, J., in dissent)

## I.    INTRODUCTION

I join the Majority in finding that our exercise of King's Bench is both proper and appropriate to these circumstances. With that said, I am mindful of the well-stated concerns voiced by the Dissents and the rationale motivating those concerns. However, unlike the Dissents, I do not believe the specific concerns raised in this appeal are limited

to one particular District Attorney, in one particular county, confined to a limited class of cases. To the contrary, I believe that the present appeal is symptomatic of larger considerations well documented by the Majority. These concerns are pervasive, ongoing and unless addressed, threaten to undermine the legitimacy of our judicial decisions in Pennsylvania's largest county.

I write separately to note my recognition of the problem and the need to remediate, but would order a different procedure to address these concerns. My proposed resolution would, again, not be limited to one county, one District Attorney and one limited class of cases but would apply statewide to any case where a PCRA petition alleges prosecutorial misconduct as the basis for a new trial, since I believe the law requires disqualification of any District Attorney's Office from investigating, evaluating, or litigating such a claim. Further, since the PCRA is civil in nature, the Commonwealth Attorneys Act and our Rules of Professional Conduct mandate that the Office of the Attorney General represent and defend the Commonwealth in all such proceedings.

In our adversarial system, courts decide disputes brought to them by parties. The parties frame the dispute, identify and present relevant evidence, and advocate for specific results based on their goals. This system arose in the context of the common law and therefore, an assumption that a court would act as a neutral arbiter between adversarial parties.

When our courts are tasked with implementing purely statutory schemes, however, that assumption no longer applies. Parties may agree on a legal outcome that is contrary to the statute enacted by the General Assembly. Since the court is exercising a purely statutory power, it is not empowered, let alone required, to grant the parties' requested relief under such circumstances. Indeed, a court cannot endorse an agreement that is illegal, contrary to public policy, or unjust. A judge's ultimate duty is to ensure justice

based on the credible evidence.  If a judge suspects an agreement is contrary to the law or based on a biased or one-sided recitation of facts, a judge must demand clarification or further evidence before granting the requested relief.

Where the parties' desired outcomes conflict with statutory commands, our courts are placed in a quandary that challenges the fundamental nature of our legal system. Judges are ill-equipped, by design, to assess the truth outside the clash of opposing positions.

Today, we address a crisis in confidence in our criminal justice system arising from non-adversarial proceedings under the Post Conviction Relief Act.[1]  Under traditional practice, the only parties to such proceedings are convicted prisoners and the prosecuting office that convicted them.  These two parties may, for whatever reason, conclude that a conviction should be vacated.  However, the PCRA grants the power to vacate a conviction to courts, not prosecutors, and vacatur may only take place after the court is convinced the conviction or sentence is sufficiently tainted by legal error.

With this in mind, I agree with the Majority that our exercise of King's Bench jurisdiction is appropriate.  Further, I agree that a remand for consideration of timeliness of the PCRA petition is necessary.  In addition, if the PCRA court finds the petition timely, I would direct it to provide an explicit consideration (with accompanying factual findings) of the materiality of the alleged *Brady*[2] violation.  However, I depart from the Majority on the question of who may participate in PCRA proceedings.  I conclude the Attorney

---

[1] This crisis is not limited to one case or even the current appeal.  It is the cumulative result of at least 51 convictions overturned by agreement with no re-trial.  In many of these cases, as the Majority points out in exceptional detail, both state and federal judges have questioned the basis for the relief.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

General has the obligation[3] to represent the Commonwealth in PCRA proceedings. Further, I would require a PCRA court to disqualify a prosecutor's office where the petition alleges a *Brady* violation or similar misconduct on the part of that office or any of its employees, even if a new prosecutor has been elected to head that office.

## II.    EXERCISE OF KING'S BENCH POWERS

As I read the dueling opinions, the Majority and the Dissent do not disagree on the rules governing this Court's exercise of King's Bench Jurisdiction. Instead, they disagree over whether those rules counsel for the exercise of our King's Bench powers in these circumstances.

While I agree with the general thrust of the Majority's analysis, I emphasize different circumstances. Fundamentally, King's Bench Jurisdiction is an appropriate (if not necessary) **option** where questions of jurisdiction are implicated in a trial court's grant of relief and appellate review is foreclosed by circumstances.[4] This is especially true where the relief is granted pursuant to a purely statutory scheme, such as the PCRA. As always, courts do not have discretion to disregard the General Assembly's commands. *See* Maj. Op. at 46 (*citing Commonwealth v. Tedford*, 228 A.3d 891, 904 (Pa. 2020). "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Mapp v. Ohio*, 367 U.S. 643, 659 (1961).

---

[3] This obligation is mandated and required by law and is distinct from the Majority's invitation to the Attorney General to participate.

[4] The Dissent seems to misunderstand my analysis and suggestions. At no point have I suggested a "staggering new conception" of PCRA proceedings or appeals. To the contrary, I merely point out that our existing Rules of Professional Conduct concerning conflicts of interest should be applied equally and evenly between defense counsel and prosecutors. Moreover, nothing herein suggests using this Court's King's Bench authority to "babysit" PCRA proceedings, Dissenting Opinion at 9, or "mandate a restructuring of the relationships and responsibilities of locally-elected District Attorneys and the OAG." Dissenting Opinion at 3 n.4.

Thus, this Court has the power, and indeed the responsibility, to ensure that a lower court does not grant relief under the PCRA unless the PCRA's statutory conditions for jurisdiction have been met. *See Commonwealth v. Whitney*, 817 A.2d 473, 475 (Pa. 2003). It is beyond peradventure that, sometimes, a PCRA petitioner has a valid claim for relief, but is ineligible for such relief because the PCRA court has no jurisdiction to grant it. *See Commonwealth v. Fahy*, 737 A.2d 214, 223 (Pa. 1999). Even if jurisdiction is established, the power to grant relief under the PCRA is limited to those circumstances identified by the PCRA itself. *See Commonwealth v. Robinson*, 82 A.3d 998, 1005 (Pa. 2013).

For example, if a PCRA court grants a new trial pursuant to an untimely PCRA petition, that order will be reversed on appeal. But what happens if there is no appeal? Does the District Attorney's failure to appeal the order somehow reverse engineer jurisdiction for the PCRA court? Obviously not.

But the Dissent contends that this error can be corrected after a new trial is held. This is problematic on several levels. First, the grant of a new trial does not ensure that a new trial will be held. Due to the passage of time, essential witnesses may have passed away. Memories fade. Other circumstantial evidence may degrade or disappear. For these reasons and others, the prosecuting office may rationally decide it can no longer meet the burden of proving its case beyond a reasonable doubt — and not because it believes the defendant is innocent.[5] One need look no further than the facts of record concerning the current Philadelphia District Attorney's Office which has agreed to overturn at least 51 convictions since 2018 with no retrial.

---

[5] As noted by the Majority (and other judges), often the Philadelphia District Attorney's Office has engineered new trials for defendants facing capital punishment or life sentences based on a philosophical opposition to the death penalty or life imprisonment, not on the facts of the underlying conviction.

Perhaps more troubling, even if the prosecuting office presses on in the face of such barriers, it may lose at the new trial. The Commonwealth cannot appeal from a not-guilty verdict. Do we create an exception to this rule where the trial is the result of the previous grant of PCRA relief? If so, why would we not allow such an appeal **before** the expense and hardships engendered by the new trial? Or better still, apply our existing Rules of Professional Conduct and existing law as a prophylactic measure against such abuse by requiring disqualification and the appointment of independent counsel to review, analyze, and litigate such claims.

I see no good reason to avoid addressing the propriety of an order granting a new trial under the PCRA immediately, regardless of whether the prosecuting office files an appeal. These circumstances counsel close review by this Court to determine if the General Assembly's commands, as embodied by the text of the PCRA, are being frustrated in the lower courts.[6] Thus, this exercise of King's Bench Jurisdiction is appropriate, regardless of the outcome this Court finally reaches. The circumstances of this case reveal an issue of serious public importance that requires this Court's consideration.

Contrary to the Dissent's position, I cannot conclude that the grant of a new trial after a **non-adversarial** PCRA proceeding is "average." Dissenting Opinion at 7 n.26. A conclusion that legal error so tainted a trial as to invalidate a verdict is an extraordinary conclusion on any day. It is even more extraordinary if such a conclusion is reached after a non-adversarial PCRA proceeding. Its effect on the integrity of the criminal justice system is immeasurable.

---

[6] I suggest that this Court refer the issue of a Rule instituting an automatic appeal from the grant of PCRA relief to our Civil Rules Committee.

Of course, the extraordinary nature of such a conclusion does not automatically render it suspect. Yet it is undeniably notable — akin to a headline of "man bites dog." And that conclusion has tremendous consequences. For the court system, it represents a significant sunk cost of resources and a potential significant cost in future resources for a new trial. Victims and witnesses also suffer from sunk costs and potential future monetary and emotional costs. The community, once assured that a criminal had been apprehended and appropriately sentenced, must now consider what went so wrong as to lead to a vacated conviction. As Justice Anthony Kennedy noted, "[t]he dignity of a court derives from the respect accorded its judgments." *Deegan v. United States*, 517 U.S. 820 (1996). Perhaps most notable is the damage done to the public's confidence in a fair and impartial legal system. Such damage can hardly be undone simply by the grant of a new trial that never — or rarely — occurs.

The General Assembly was no doubt aware of the costs of vacating a conviction when it enacted the PCRA. It nevertheless provided explicit avenues for defendants to collaterally challenge their convictions. Importantly, however, it provided explicit limitations on the jurisdiction of courts to grant relief under the PCRA and express burdens to qualify for relief.

## III.     THE NATURE OF PCRA PROCEEDINGS

## A.     Adversarial versus Inquisitorial Proceedings

Having properly exercised King's Bench jurisdiction here, we must address the issue of how to best address the problems created by non-adversarial PCRA proceedings. A non-adversarial PCRA proceeding allows the parties, through the exercise of their discretion, the power to limit what is in the record before the PCRA court. As Justice Wecht has noted:

> In its simplest terms, the adversarial process is one in which legal disputes are resolved by having the parties present their conflicting views of fact and law before an impartial and relatively passive decision-maker. … Other

models exist, but the adversarial process reigns in this country, where we rely upon it in the main to produce accurate verdicts, while also respecting individual autonomy.

With this definition of the adversarial process in mind, one sees clearly the *dramatis personae*, their respective roles, and the method to be used. Two rival sides, a neutral arbiter, the sharp clash of proofs, and the resulting impartial (not infallible) judgment. Upset this dialectic, and the machinery of our jurisprudence can falter.

…

A scrupulously neutral decision-maker accedes to party control of the proceeding, and, in turn, that control lends the enterprise its legitimacy.

*Quigley v. Unemp. Comp. Bd. of Review*, 263 A.3d 574, 601 (Pa. 2021) (Wecht, J., Concurring). The Supreme Court of the United States put it perhaps more bluntly: "Courts are essentially passive instruments of government. They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *U.S. v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) (internal citations, quotation marks, and brackets omitted).

Because I agree that our justice system is adversarial in nature, I cannot join the Concurring and Dissenting Opinion's conclusion that merely remanding to the PCRA court with instructions for the existing parties (but not the Attorney General) to participate in a hearing will cure the present problem. The PCRA court essentially **begged** the parties (and the Families) to present evidence at a hearing. Those parties (and the Families) instead argued that the existing evidence of record was sufficient to decide the relevant issues of fact.

In some sense, a hearing **was** held. When asked to present their witnesses, the parties declined and instead rested on a stipulated record. Were we to remand this case with the simple direction of holding a hearing, I presume a more formal version of the same process will occur. No witnesses will testify, and the record will be precisely the

same as it is now. The PCRA court will once again render its decision on the same record.

I recognize this is how our adversarial system works. Like any system devised by humans, it is not perfect. Nonetheless, a determined Commonwealth attorney may, by selectively limiting the factual record supplied to the PCRA court, significantly impede that PCRA court's ability to fairly assess whether the PCRA's requirements have been met. The Concurring and Dissenting Opinion appears to favor transforming our PCRA courts into inquisitorial tribunals, empowered to investigate facts and call their own witnesses. Even if I were to agree that this is a sound solution (to be clear, I do not), our courts are simply not currently trained, equipped or funded to perform these functions.

To steal an aphorism from an unnamed associate of Winston Churchill, our adversarial system of justice is the worst system, except for all the alternatives.[7] We always should be striving to identify problems and improve the process. Nonetheless, this Court, as guardian of the judicial system in this Commonwealth, should take care not to destroy the core of the system while attempting to fix problems at its fringes.

As implemented by *Brown I*, PCRA proceedings are an outlier that do not fit comfortably within our adversarial system. Pursuant to *Brown I*, the parties do not fully control the contours of the dispute. They cannot reach an agreement that is binding on the PCRA court to grant relief. Moreover, the attorney for the Commonwealth may not, solely through the exercise of discretion in a PCRA proceeding, bargain away the community's interest in an existing criminal conviction. In other words, the prosecutor and the petitioner are **not** the only parties to a PCRA proceeding. The PCRA court itself

---

[7] "Indeed it has been said that democracy is the worst form of government except for all those other forms that have been tried from time to time…" Winston Churchill, November 1947 speech to the United Kingdom House of Commons.

is no longer purely a neutral referee, but a guardian of the community's interest in an existing conviction by ensuring the Act's requirements are met before relief is granted.[8]

This obviously creates tension with the traditional role of judges in our adversarial system. This tension has led to expressions of a crisis of confidence from all directions.[9] District Attorney Krasner represents a portion of the public (who voted him into office) that believes the system covers up police and prosecutorial misconduct. He frequently publicizes overturned convictions and other established instances of police and prosecutorial misconduct. The families of murder victims represent the other side of public opinion, who perceive that District Attorney Krasner consistently misleads courts in pursuit of a political agenda. They point to the laundry list of claimed and established ethical violations committed by District Attorney Krasner's office. Thus, the base dispute driving this case is political in nature, and this Court should tread warily, if it all, into such matters.

Nevertheless, that does not mean we should just throw up our hands and pretend that this crisis in confidence does not exist. We are, indisputably, bound by the parameters of the PCRA and our organic charter in addressing the problem. Under our

---

[8] Contrary to the Dissents' assertions, I do not suggest the court abandon its neutrality, especially with respect to fact-finding. I merely recognize that, pursuant to *Brown I*, a PCRA court is not bound by an agreement reached by the Commonwealth and the petitioner. The court is **required** to independently ascertain whether all of the requirements of the PCRA for relief have been satisfied. The "community interest" at stake is the interest in ensuring that the PCRA, as duly enacted legislation, is being followed, regardless of the desires of the nominal parties. It certainly would be novel to suggest that courts are acting improperly by ensuring that the law is followed.

[9] Public confidence in these matters and the attendant "crisis of confidence" is not the product of any personal animus toward DA Krasner or his policies. Rather, as chronicled in extensive detail by the Majority, it is the opinion of numerous state and federal judges, arrived at after dozens of proceedings wherein DA Krasner's office has misrepresented facts and omitted relevant and material evidence in pursuit of new trials for capital defendants.

charter's scheme, the General Assembly enacts laws to address issues of state-wide significance, the executive branch oversees the enforcement of those laws, and the courts apply the laws to discrete disputes. As all parties recognize, the legislative enactment of the PCRA is central to the issues currently before this Court.

**B.      Statutory Mandates Regarding the Attorney for the Commonwealth**

The PCRA is a duly enacted law that provides the parameters for collateral attacks on criminal convictions and sentences. While this Court is empowered to regulate the practice of law, we may not "abridge, enlarge [or] modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court[.]" PA.CONST. art. V, § 10(c). Further, as the Dissent notes, our Rule-making authority is limited by consideration of the separation of powers under our Constitution. *See* Dissenting Opinion at 23. We therefore may not use our Rule-making powers to modify the clear commands of the PCRA.

The PCRA does not explicitly define the parties involved in a PCRA proceeding, yet its procedures clearly address who may initiate a PCRA proceeding. The PCRA requires a person seeking relief to file a petition. *See* 42 Pa.C.S. § 9545(a) ("the filing of a petition under this subchapter"); (b) (entitled "Time for filing petition.").

Importantly, however, the Act does not explicitly require any response to the petition. Our rules governing PCRA procedure state that "an answer to a petition for post-conviction collateral relief is not required." Pa.R.Crim.P. 906(A). Furthermore, a failure by "the attorney for the Commonwealth" to file an answer "shall not constitute an admission of the well-pleaded facts alleged in the petition." *Id.*

Both the PCRA and our rules refer only to "the Commonwealth" or "the attorney for the Commonwealth" but fail to specifically define who is the attorney for the

Commonwealth.[10]   *See*  Pa.R.Crim.P.  900(B)[11]; Rule  906(A)  ("the  attorney  for  the Commonwealth may elect to answer"); Rule 906(E) ("The Commonwealth shall file an answer…"); Rule 907(1) ("any answer by the attorney for the Commonwealth"); Rule 908 (repeatedly  referencing  "the  Commonwealth's"  motions  or  answers);  Rule  909 (referencing "the Commonwealth['s] answer" and directing notice to "the attorney for the Commonwealth").  Existing practice, since the PCRA's enactment, has relied on local district attorney's offices to represent the Commonwealth.  Pointing to existing practice, however, simply begs the question of what the General Assembly itself has said about who has the right or duty to represent the Commonwealth under the PCRA.

Both the Majority and the Dissent acknowledge that this Court has consistently held that PCRA proceedings are not criminal proceedings.  *See* Maj. Op. at 99; Diss. Op. at 24 (both citing *Commonwealth v. Haag*, 809 A.2d 271, 284 (Pa. 2002)).  Indeed, not only this Court, but the United States Supreme Court has held that PCRA proceedings are "civil in nature."  *Haag*, 809 A.2d at 284; *see also Scott v. Pa. Bd. of Probation and Parole*, 284 A.3d 178, 187 (Pa. 2022) (recognizing that the High Court has declared post-conviction relief "not part of the criminal proceeding itself, and … in fact considered to be civil in nature.").[12]

---

[10] The one arguable exception is in 42 Pa.C.S. § 9543.1, where the Act imposes duties and grants rights to "the Commonwealth[.]"  But the remedy provided by Section 9543.1 is an order directing DNA testing of evidence.  *See id.* at (d).  The petitioner is still required to file a separate PCRA petition seeking relief within one year of receiving the results. *See id.* at (f).  Further, "the Commonwealth" does not distinguish between local district attorney offices and the office of the attorney general.

[11] Rule 900(B) explicitly only addresses capital cases.  Nevertheless, it provides some guidance on identifying proper parties to a PCRA proceeding.

[12] As I acknowledged above, this Court enacted procedural rules governing PCRA proceedings under the Rules of Criminal Procedure.  However, this mere organizational choice does not control over our established precedent regarding the substantive nature of PCRA proceedings.

As both the Majority and the Dissent recognize, the Commonwealth Attorneys Act, 71 P.S. §§ 732-101 - 732-506, (the CAA) explicitly addresses who has the right to represent the Commonwealth **in a civil matter**. *See* Majority Opinion at 99; Dissenting Opinion at 23-24. The CAA instructs that the "Attorney General <u>shall</u> **represent the Commonwealth and all Commonwealth agencies … in any [civil] action brought by or against the Commonwealth** or its agencies, **and may intervene in any other [civil] action[.]**" 71 P.S. § 732-205(c) (emphasis supplied).[13] Thus, the General Assembly, through the CAA, expressly requires the Attorney General to represent the Commonwealth in PCRA proceedings.[14] At the very least, the CAA provides the Attorney General the authority to intervene in any PCRA proceeding.

---

[13] The Dissent suggests that a PCRA petition is not an action brought against the Commonwealth. *See* Dissenting Opinion at 31. It asserts that PCRA petitioners are not seeking relief from the Commonwealth. *Id.* at 31-32. Apparently, it is not the Commonwealth who prosecuted and is imprisoning the petitioner, but some other, undefined entity. Further, even the Dissent acknowledges, albeit in other contexts, that elected officials, using taxpayer money, have traditionally responded to PCRA petitions. Finally, the petition in this case belies the Dissent's idle theorizing: the named Respondent on the caption is the "Commonwealth of Pennsylvania[,]" not some unidentified entity. Apparently, the Dissent believes counsel for PCRA petitioners have been naming the wrong respondent for decades.

[14] The Dissent's concern about my "novel reading" of the CAA, Dissenting Opinion at 32, provides little to no legal analysis. While the Dissent may certainly express its opinion that the existing approach to PCRA litigation is *ipso facto* the correct approach, unprincipled resistance to questioning assumptions is not without its own historical faults. Moreover, concerning ourselves with the consequences of reordering PCRA defense in the Commonwealth appears to be drastically overstated (not that this Court should blindly fixate on the consequences of performing our interpretive obligations: "*Fiat justitia ruat caelum* (Let justice be done though the heavens fall))."

In many of the precedents detailed by the Majority, the OAG has either filed *amicus* briefs or been asked to intervene. Participation by the OAG in matters where the adversarial process has been stymied is nothing new. As for the OAG becoming "responsible for the thousands of PCRA petitions filed each year in each of Pennsylvania's sixty-seven counties[,]" *id.*, it is important to remember that although an additional burden may be imposed on the OAG, a corresponding reduction in workload accrues to the benefit of local district attorney's offices. The proposed shift is meant to align with the commands (continued…)

The only contrary authority is found in legislation enacted in 1850. Prior to 1850, the Attorney General "was the sole repository of the power of law enforcement in this Commonwealth, enjoying the same powers and prerogatives that the Attorney General of England enjoyed at common law." *Commonwealth v. Carsia*, 491 A.2d 237, 242 (Pa. Super. 1985). Through the Act of May 3, 1850, P.L. 654, § 1, our General Assembly created an elected position previously unknown in Pennsylvania: the office of county district attorney. *See id.* That act granted district attorneys the powers that had previously been deployed by deputy attorney generals:

> The officer so elected shall sign all bills of indictment, and conduct in court all criminal and other prosecutions in the name of the Commonwealth, or when the State is a party, which arise in the county for which he is elected, and perform all the duties which now by law are to be performed by deputy attorney generals, and receive the same fees or emoluments of office: Provided, Said district attorney shall in no case whatever have authority to enter nolle prosequi in any criminal case, either before or after bill found, or to discharge a prisoner from custody, without first having obtained the approbation of the court in writing.

16 P.S. § 9952.[15]

Despite the enactment of Section 9952, the delineation of powers between the Attorney General and district attorneys remained an issue of significant dispute for over a century. *See Carsia*, 491 A.2d at 242-246. Ultimately, the office of the Attorney General was enshrined in our Constitution, and the General Assembly enacted the CAA. *See id.* at 246. Pursuant to our organic charter, adopted in 1978, the Attorney General "shall be

---

of the CAA, comply with our existing Rules of Professional Responsibility, ensure the fair and impartial investigation, litigation, and where appropriate, concession of PCRA claims and promote the public's confidence in the integrity of PCRA procedures through zealous and effective advocacy in a truly adversarial process. This is all we can ask for and precisely what the public demands in a fair and impartial criminal justice system.

[15] The most current version of this statute is found in the County Code and applies explicitly to second through eighth class counties. *See* 16 Pa.C.S. § 14302.

the chief law officer of the Commonwealth and shall exercise such powers and perform such duties as may be imposed by law." PA. CONST. art. IV, § 4.1.

The CAA is one such law imposing duties on the Attorney General. As set forth above, the CAA requires the Attorney General to represent the Commonwealth in any civil action brought against the Commonwealth. *See* 71 P.S. § 732-205(c).

In contrast, the Act of 1850 does not grant district attorneys the power to **defend** civil actions. As mentioned above, PCRA petitioners seek relief from the Commonwealth through a civil collateral attack on their criminal convictions and sentences. This does not constitute an "other prosecution" on behalf of the Commonwealth under Sections 9952 and 14302. The CAA does not define "prosecution," nor do Sections 9952 and 14302. The dictionary definition of the intransitive verb "prosecute" is "to **institute and carry on** a legal suit or prosecution." www.merriam-webster.com/dictionary/prosecute, last visited March 6, 2026 (emphasis supplied). PCRA petitions are prosecuted and instituted by a petitioner, not the Commonwealth. Moreover, the Commonwealth and its attorney need not even file an answer to a PCRA petition. Thus, it is the CAA that directly applies to PCRA proceedings, and not Sections 9952 and 14302.

## C. Conflicts of Interest While Practicing Law

Beyond that, however, I will point to one area where our current practice is inconsistent with existing precedent in a way that contributes to the crisis in confidence plaguing our PCRA proceedings. Our precedent has, for 40 years, required disqualification of defense counsel when they attempt to argue their own previous ineffectiveness. *See Commonwealth v. McBee*, 520 A.2d 10, 13 (Pa. 1986) ("When appellate counsel asserts a claim of his or her own [ineffectiveness] on direct appeal, the case should be remanded for the appointment of new counsel …"). This disqualification

applies to other lawyers employed by the same institution. *See Commonwealth v. Ciptak*, 665 A.2d 1161, 1161 (Pa. 1995).

This rule has, however, never been applied to prosecutors in the PCRA setting. Yet, where a PCRA petition alleges that a prosecutor, or a fellow attorney in the same office, intentionally committed a *Brady* violation, it raises a perceived conflict of interest. If the allegation is true, this will have negative repercussions to the offending prosecutor's reputation and raise the specter of professional discipline. *See* Pa.R.P.C. 3.1 (prohibiting counsel from advocating positions that do not have an adequate basis in law or fact); 3.3 (requiring candor toward the tribunal); 3.8(d) (requiring a prosecutor to timely disclose exculpatory evidence or information to the defense). That prosecutor, or an employee of the same office, may seek to avoid such consequences. In other words, the attorney for the Commonwealth in the PCRA proceeding may have a motive to continue to deny or even cover-up the existence of *Brady* material. Thus, the attorney for the Commonwealth in the PCRA proceedings is in a position where their "professional obligation will be in conflict with [their] personal desire or feelings and thereby threaten, or at least call into question, the performance of [their] professional duties." *Commonwealth v. Balenger*, 772 A.2d 86, 91 n.4 (Pa. 2001).

This constitutes a clear and direct conflict of interest. A conflict of interest is "[a] real or seeming incompatibility between two interests that one possesses or is obligated to serve, esp[ecially] when one of those interests might benefit the person to whom both are entrusted. A conflict arises when an official may benefit personally from a decision made in an official capacity." Black's Law Dictionary (12th Ed. 2024) ("CONFLICT OF INTEREST"). Under our existing rules regulating the practice of law, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Pa.R.P.C. 1.7(a).

Allegations of prosecutorial misconduct and cover-up necessarily imply that the prosecutor or prosecutors may be called as witnesses. Under our Rules of Professional Conduct, neither the subject prosecutor nor any other member of the prosecutor's office may act as an attorney in a proceeding where they are likely to be called as a fact witness. *See* Pa.R.P.C. 3.7(a); *Ciptak*.[16]

PCRA courts should not hesitate to disqualify any such prosecutor or prosecutor's office in these circumstances. Indeed, we require disqualification of defense counsel under similar circumstances, even though non-indigent defendants have a constitutionally recognized right to counsel of their choosing. As demonstrated above, district attorneys have no constitutional or statutory right to defend PCRA petitions. Further, the possibility that an independent third party will review claims of prosecutorial misconduct can only have a salutary effect on prosecutors when exercising their ethical duties in a criminal prosecution.

Prosecutors occupy a unique position in our justice system. They are undoubtedly elected officers who fall under the executive branch of our government, regardless of whether that is at the state or county level. Yet they are also undisputably officers of the court, bound by the Rules of Professional Conduct like any other barred attorney. As such, this Court should remain mindful of democratic legitimacy of prosecutors exercising their discretion. Be it "tough on crime," "reform," or any other legal political position, they are accountable only to the electorate for matters properly within their discretion. The mirror image to this, however, is that prosecutors should remain mindful of their ethical duties to the courts. They must not let their political zeal lead them to attempt to mislead

---

[16] The Kentucky Supreme Court has held that, under a Kentucky statute, a prosecutor should recuse when they have knowledge that they are likely to be called as a witness in a collateral proceeding. *See Bowling v. Commonwealth*, 80 S.W.3d 405, 420 (Ky. 2002). However, the *Bowling* Court concluded the petitioner did not establish that he was prejudiced by the prosecutor's failure to recuse. *See id.*

judges or juries through the suppression of relevant evidence, whether it be exculpatory or inculpatory. This Court cannot police the political aspects of the prosecutor's office, but it not only may, but must, police the prosecutor's conduct in court the same as any other officer of the court.[17] Thus, I believe that our law, our Rules of Professional Conduct, and public policy all require disqualification of any prosecutor's office accused of misconduct as a basis for a requested new trial.[18] Correspondingly, I would appoint the

---

[17] The Dissent asserts that "[i]t is of no moment whether Justices of this Court" agree with Philadelphia's voters regarding DA Krasner's policies. Dissenting Opinion at 39. First, this is a misrepresentation of my position, as explicitly laid out above. I agree with the Dissent that DA Krasner's discretionary policies are generally beyond this Court's bailiwick. In contrast, DA Krasner's, and his office's, **performance** as officers of the court is an issue fundamentally within this Court's purview. Multiple judges have identified and decried unprofessional conduct by members of the DAO since DA Krasner was first elected. Contrary to Justice Wecht, I believe this Court — not the electorate of Philadelphia — has the duty and responsibility to address issues the DAO owes to the courts, such as the duty of candor, especially in non-adversarial proceedings. Further, this Court has the power, and thus the duty, to regulate the practice of law. One such long-standing regulation requires attorneys to withdraw when they have a conflict of interest. I can find no wording in our Rules to support the Dissent's belief that District Attorneys are exempt from conflict of interest rules because they won an election.

[18] The Dissent notes that the United States Supreme Court has never "seen fit to disqualify prosecutors from responding to *Brady* claims[.]" Dissenting Opinion at 28. I do not doubt this is true, but I am equally certain this fact is irrelevant to the question at hand. The issues before us are ones of state law, not federal. This Court has never held that prosecutors are immune from claims of conflict of interest under our Rules of Professional Conduct. Accordingly, the High Court would have no reason to apply state law in the first instance. Further, in construing these state authorities, the Dissent creates a new canon of construction, whereby tradition trumps text and intent. The Dissent desires to add the words "except for prosecutors" into Rule 1.7: "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Pa.R.P.C. 1.7(a). To even begin to justify such an addition, one would need to identify how the added text served the clear intent of the drafting body. The Dissent makes no such attempt, instead resting on the laurels of tradition as its interpretive polestar that the missing words are nonetheless part of the Rule. Instead of this novel and radical method of construing the CAA and our Rules of Professional Conduct, I fall back on accepted methods of construction, focusing on the text and its intent.

Attorney General to represent the Commonwealth in all such civil proceedings.[19]  Such a procedure will remove the claimed taint and any illegality in the underlying prosecution while protecting the public's interest in a fair and impartial proceeding.[20]

---

[19] The Dissent seems to believe that allowing the OAG to review, investigate, and defend claims of prosecutorial misconduct by a locally elected DAO will result in the OAG automatically opposing relief, refusing to identify mistakes in prior prosecutions, and correcting errors "necessary in order to ensure that the defendant receives the fair trial to which he is constitutionally entitled."  Dissenting Opinion at 10.  I see things differently and presume that the OAG will perform its constitutionally mandated duties with the honor, integrity, and perhaps most importantly, the impartiality required.  At the very least, I fail to see how the OAG will act any less ethically than a local DAO which is operating under a conflict of interest.

[20] The Dissents insist that my remedy will result in "a complete upheaval and restructuring of the PCRA system by judicial fiat."  Concurring and Dissenting Opinion at 10, n.8.  I disagree.  Nothing in **this** Opinion changes the substance or procedure of PCRA proceedings.  Applying basic principles of conflict of interest evenly (and uniformly across the Commonwealth, not just in one county) to prosecutors and defense attorneys, removing attorneys accused of prosecutorial misconduct in the PCRA context and replacing them with independent and impartial investigators and litigators protects both the spirit and the letter of the PCRA statute.  Both Dissents seem oblivious to these issues and instead rely upon the "this is not our job" philosophy.

Once again, I disagree.  It is the job of the courts to ensure a fair and impartial process to identify prosecutorial error or conduct that results in wrongful convictions while simultaneously upholding the ethical standards of our profession.  Indeed, "…courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *Wheat v. U.S.*, 486 U.S. 153, 160 (1988).  The idea that courts should sit silently as injustices unfold under their very noses is bewildering.  Judges occupy a rarified position in our system of justice and are not just "potted plants" in this process.  Bridget May McCormack, *Staying off the Sidelines: Judges as Agents for Justice System Reform*, 131 Yale L. J. 175, 178 (October 24, 2021).

Indeed, DA Krasner himself makes the most compelling case for removing prosecutors with a conflict of interest from PCRA proceedings. According to DA Krasner, prior Philadelphia District Attorneys have consistently engaged in prosecutorial misconduct, including the mishandling of *Brady* claims.  *See* Commonwealth Brief at 59-60; *see also Prosecutorial Misconduct in the Philadelphia District Attorney's Office*, **no author listed**, Peter L. Zimroth Center on the Administration of Criminal Law (2024), at 6-8, 18.  While the accuracy of these claims is beyond the scope of any single proceeding, it is beyond cavil that DA Krasner has identified an appearance of impropriety in the historical (continued…)

## IV. PCRA PROCEEDINGS BELOW

### A. Timeliness

I largely agree with the Majority's analysis of the instant PCRA proceedings. However, I find it important to emphasize the content of Brown's separate petitions regarding timeliness to clarify exactly how the reasoning supplied by the PCRA court was insufficient on its face.

Brown initiated the current proceedings by filing a second PCRA petition in June 2020. This petition was facially untimely. *See* R.R. at 10 (Second PCRA Petition at ¶ 16). Thus, Brown bore the burden of proving that an exception to the PCRA's timebar applied, otherwise the PCRA court did not have jurisdiction to address the petition. *See id.*; *see also Commonwealth v. Gamboa-Taylor*, 753 A.2d 780, 783 (Pa. 2000). Further,

---

failure to recognize the inherent conflict of interest with a DAO defending its own prior conduct against *Brady* claims on collateral review.

Since his election in 2017, DA Krasner has accused generations of prosecutors and law enforcement officials over multiple administrations including those of former Governor Rendell, former Chief Justice of the Pa Supreme Court Ronald Castille, former Judge Lynn Abraham and DA Seth Williams and his successors of engaging in a vast conspiracy to frame innocent citizens of capital murder, planting incriminating evidence, burying exculpatory evidence and suborning perjury. *See* Majority Opinion at 69-87 (summarizing cases where the DAO has conceded relief in collateral proceedings since DA Krasner took office).

Per DA Krasner and his Conviction Integrity Unit, those crimes continued through appeals and PCRA proceedings spanning decades. What better evidence of the need to remove an entire prosecutor's office from defending against their own misconduct than those claimed by DA Krasner and his staff in their efforts to overturn multiple capital convictions and death sentences?

If DA Krasner is correct, the wrongful convictions he has identified are not isolated incidents of prosecutorial misconduct to be rooted out in individualized adversarial proceedings. To the contrary, they would be the tip of the iceberg of a vast prosecutorial conspiracy. If true, the proverbial fox is guarding the henhouse. Who watches the watchers? Surely, our answer cannot be the watchers who allegedly abused their powers and hid the corruption for decades!

appellate courts must address the timeliness of a PCRA petition even if the PCRA court itself did not. *See Commonwealth v. Whitney*, 817 A.2d 473, 478 (Pa. 2003).

Initially, Brown alleged that his petition was timely because the "government interference" and "previously unknown facts" exceptions applied:[21]

> 18. This petition meets the requirements of 42 Pa. C.S. § 9545(b)(1)(i) & (ii) because many of the facts upon which the claim is predicated – a 1998 investigation and finding by the Internal Affairs Department ("IAD") of the Philadelphia Police Department of misconduct by Detective Baker, for denying a suspect he interrogated the right to counsel, and the Commonwealth's knowledge that in 1991, Detective Baker, during the investigation of another Philadelphia murder case, engaged in unconstitutional and coercive interrogation tactics – were suppressed by the Philadelphia District Attorney's Office and by the Philadelphia Police Department since the outset of this case. *See* 42 Pa. C.S. § 9545(b)(1)(i). Similarly, because of those non-disclosures and mischaracterizations, the facts upon which this claim is predicated could not have been ascertained earlier by the exercise of due diligence. *See* 42 Pa. C.S. § 9545(b)(1)(ii).
>
> 19. Petitioner could not have discovered the facts set out in the preceding paragraph in the exercise of due diligence until June 24, 2019 when, in *Commonwealth v. Hollman*, CP-51-CR-093311-1991 (Phila. County C.C.P.), (a) the parties filed their Joint Stipulations of Fact of Petitioner Chester Hollman, III, and Respondent Commonwealth of Pennsylvania, and (b) the Commonwealth filed the Commonwealth's Answer to Counseled PCRA Petition. This Petition is timely filed as it is filed within one year of June 24, 2019. *See* 28 Pa. C.S. §9545(b)(2).
>
> 20. In addition, Petitioner sets forth averments taken from the deposition of former Det. David Baker that was conducted on August 2, 2017 in the case, Anthony Wright v. City of Philadelphia, et al., No. 16cv-0502 (E.D. Pa.). Petitioner was not aware that Det. Baker was deposed in that case until December 20, 2019 and the deposition transcript is not a publicly filed document. Petitioner's counsel learned about the deposition transcript when communicating with Wright's civil attorney on December 20, 2019. Before that neither Petitioner, nor his counsel, knew that Detective Baker had been deposed. Accordingly, Petitioner's reliance on the Baker deposition in this Petition is timely, as well.

R.R. At 6-7 (PCRA Petition at ¶¶ 17-20).

---

[21] 42 Pa. C.S. § 9545(b)(1)(i) & (ii).

Importantly, Brown did not raise the claim which formed the basis of the PCRA court's grant of relief — Vann's alleged identification of Kennisha Paige as a conspirator — until a year later, when he filed an amended petition. However, the amended petition, while raising the substantive *Brady* claim based on Vann's alleged identification of Kennisha Paige, did not explicitly allege that this new claim satisfied **any** timeliness exceptions. The joint stipulation subsequently filed with the PCRA court provided that the relevant documents had not been disclosed but did not otherwise explicitly address the issue of timeliness.

Much like the Majority, I make these observations not to declare Brown ineligible for PCRA relief. Instead, I am merely highlighting that we cannot infer the PCRA court's reasoning on timeliness from its terse resolution. The PCRA court issued a short order vacating Brown's judgment of sentence. That order is supplemented only by the judge's in-court statement:

> I'm going to find that the record establishes that the assigned detective in this case learned through investigation that witness, Ronald Vann, had falsely identified Kennisha Paige as being a participant in the January 19th, 2003 robbery and murder here at issue, and that this false identification was not disclosed to the defense; that a critical witness had made a demonstrably false identification of someone as being a participant in the same criminal events; however, the subject of the charges against [Brown] was, in my view, impeachment evidence of a different character than the impeachment material used at trial and I find that the suppressed evidence satisfies the standard for materiality under *Brady* and its progeny.

R.R. at 1004 (N.T., 5/5/2023, at 4).

This statement makes clear the PCRA court found that Vann falsely identified Paige as a conspirator. However, notably absent from the court's statement is any consideration of the timeliness of the claim that Vann falsely identified Paige. As ably set forth by the Majority, this omission is critical, since the PCRA court had no power to grant relief absent jurisdiction. Accordingly, I agree with the Majority that a remand to the PCRA court for further fact-finding and analysis is justified.

**B.    Materiality Under *Brady***

Furthermore, while the PCRA court briefly discussed materiality under *Brady*, I would direct the court to expand this analysis on remand. Even if we concede that the PCRA court's factual finding regarding Vann's statement is supported by the record, it is not immediately apparent that disclosure of Vann's identification of Paige as a conspirator was material. "Evidence is material for *Brady* purposes when its absence caused prejudice. This is a high bar, as the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the *Brady* context." *Commonwealth v. Thomas*, 323 A.3d 611, 639 (Pa. 2024).

*Brady* requires that: (1) the evidence was favorable to the defendant, whether it is exculpatory or mere impeachment; (2) the evidence was suppressed by the prosecution, whether willfully or inadvertently; and (3) prejudice ensued. *See Commonwealth v. Conforti*, 303 A.3d 715, 725-726 (Pa. 2023). That Vann lied to detectives about Paige's involvement is certainly evidence favorable to Brown, as it could be used to impeach Vann, who was one of two witnesses tying Brown to the robbery. The PCRA court found the Commonwealth failed to disclose this statement to the defense. Before granting such relief, however, the PCRA court was required to assess whether Vann's statement was material under *Brady*.

Given the "high bar" of materiality under *Brady*, the PCRA court's terse analysis is insufficient under the circumstances of this case. This is a complicated issue that requires an analysis of the specific circumstances. On the one hand, absent Vann's and Lyons's testimony, the Commonwealth presented no evidence that tied Brown to the robbery. And of the two, Vann's testimony was the most damaging. Nonetheless, Vann testified before the jury that he lied in his first two statements to detectives, as he was trying to avoid

inculpating himself. *See* N.T., 7/22/2004, at 219-223; 229-230; 232-233; 249; 252; 259-260; 267; 272-274; 284; 287; 291; 297; 310; 365-366. Perhaps even more relevant, the trial court opined at sidebar that since Vann had already been called out on numerous lies in his statements to police, it did not necessarily help a co-defendant to point out more lies during cross-examination. *See id.* at 278.

Thus, Vann was caught in multiple lies across at least two statements and he admitted he provided false information to protect himself. While pointing out that he also lied about Paige's involvement could certainly have helped impeach Vann, I am not easily convinced that there is a reasonable probability that this information, considering all the other lies Vann admitted to, would have caused the jury to change its mind about Vann's credibility. With that said, the PCRA court's explicit explanation leaves room for multiple theories of materiality. Since I would remand for a discussion of timeliness, I would provide the PCRA court an opportunity to more fully address its finding of materiality should it conclude that Brown's petition met a timeliness exception.

## V.     Conclusion

In conclusion, I agree with the Majority that a remand for consideration of timeliness of the PCRA petition is necessary. If the PCRA court finds the petition timely, I would further direct it to provide an explicit consideration (with accompanying factual findings) of the materiality of the alleged *Brady* violation. With respect to the question of who may participate in PCRA proceedings, I conclude the Attorney General not only has the right to intervene, but the obligation to represent the Commonwealth in PCRA proceedings. Further, I would require a PCRA court to disqualify a prosecutor's office where the petition alleges misconduct on the part of that office or any of its employees, even if a new prosecutor has been elected to head that office.